Doyle Connelly, Plaintiff-Appellant, *v.* County of Clark, Defendant-Appellee.

(No. 12071; )

Fourth District—December 6, 1973.

*Rehearing denied March 1, 1974.*

CRAVEN, P. J., dissenting in part and concurring in part.

Thomas J. Logue, of Mattoon, for appellant.

Omer T. Shawler, State's Attorney, of Marshall (John J. Bresee, of counsel), for appellee.

Mr. JUSTICE SIMKINS delivered the opinion of the court:

Plaintiff appeals from a summary judgment entered in the trial court seeking injunctive and declaratory relief against the operation by Clark County of a gravel pit. The trial court found that the County may operate a gravel pit for its own use, and that its use of motor fuel tax funds for such a purpose was statutorily authorized. It also found that the County was authorized to sell gravel from the pit to other governmental units.

The facts are not contested. In 1966, Clark County, Illinois, purchased land and commenced operation of a gravel pit for the benefit of the county highway department in the construction and maintenance of county roads and for sale to other units of local government within the county based on a computed price per unit. There is no requirement that all governmental units purchase gravel from the county pit, and, in fact, many units purchase from other pits. The county uses its own employees and machinery to operate the pit, and the entire cost of the operation is paid for by the county out of a special gravel account of the county highway fund. The purchasing units, including the county, pay for the gravel out of any funds available for highway maintenance, including state motor fuel tax funds. These payments are then allocated to the gravel accounts. Every year since the beginning of the operation the county has requested and received permission from the Department of Public Works and Buildings of the State of Illinois, the supervising agency for the use of state motor fuel tax funds, to furnish gravel from the pit to the various county units of local government. The county has also apparently received permission to purchase gravel for its own roads out of fuel tax funds allocated to it.

On appeal plaintiff raises two basic issues: (1) Whether the county has the statutory authority to sell gravel in excess of its own needs to other governmental units within the county and (2) Whether the county has the statutory authority to operate a gravel pit through the use of state motor fuel tax funds.

■■ Both parties agree that the county has the statutory authority to operate a gravel pit to provide for the maintenance of county highways. Although the exact source of this power is never clearly stated, we assume such authority is to be derived from the language in Ill. Rev. Stat. 1971, ch. 121, sec. 5—601 which states that "For the purpose of improving, maintaining, repairing, constructing and reconstructing the county highways to be maintained, repaired and constructed by the county

\* \* \* and for the payment of lands, quarries, pits or other deposits of road material required by the county for such purpose \* \* \* the county board shall have the power to levy an annual tax \* \* \*." If the county has the power to tax in order to finance a gravel pit operation, the basic power then of the county to operate the pit is a necessary concomitant.

Section 5—601 clearly gives the county the right to tax to establish a gravel pit for the maintenance of county roads. The statute, however, refers only to county roads and is silent as to township roads, road district roads, municipal roads, and state roads. These roads, although physically within the county, are outside the operating control of the county and selling excess gravel for the maintenance of these roads in competition with private gravel pit owners is outside the purview of 5—601.

█ █ █ It is a well established rule that the powers of the multifarious units of local government in our State, including counties, are not to be enlarged by liberally construing the statutory grant, but, quite to the contrary, are to be strictly construed against the governmental entity. (*Arms v. City of Chicago*, 314 Ill. 316, 145 N.E. 407 (1924).) A county is a mere creature of the State and can exercise only the powers expressly delegated by the legislature or those that arise by necessary implication from expressly granted powers. (*Heidenreich v. Ronske*, 26 Ill.2d 360, 187 N.E.2d 261 (1962).) This necessarily implied power has been interpreted to mean that which is essential to the accomplishment of the statute's declared object and purpose—not simply convenient, but indispensable. (*Merrill v. City of Wheaton*, 379 Ill. 504, 41 N.E.2d 508 (1942).) However, the implied power need not be absolutely indispensable, and it is sufficient if it is reasonably necessary to effectuate a power expressly granted. (*Klever Shampay Karpet Kleaners v. City of Chicago*, 323 Ill. 368, 154 N.E. 131 (1926); *Houston v. Village of Maywood*, 11 Ill.App.2d 433, 138 N.E.2d 37 (1956).) It cannot, however, be said that the authority to sell to other governmental units is necessarily incident to or is reasonably necessary to effectuate its express power of establishing a gravel pit to maintain county roads, and the fact that it is convenient for the county to do so is insufficient. The sale of gravel by the county to other governmental units is then invalid and outside the statutory grant of authority. To hold otherwise would represent a drastic deviation from traditional methods of interpreting grants of power to local governmental units in our State.

We do not mean to imply that the county has no authority to sell gravel from its legally owned pit to other governmental units on a pro-rated cost basis when such units enter into a joint or cooperative agree-

ment or venture. Ill. Rev. Stat. 1971, ch. 121, sec. 1—102 provides that "it is further declared that highway transportation system development requires the cooperation of State, county, township, and municipal highway agencies and coordination of their activities on a *continuous and partnership basis* and the legislature intends such cooperative relationships to accomplish this purpose." (Emphasis added.) Furthermore, the intergovernmental cooperation intended by section 1—102 is further encouraged by the adoption of section 10 of Art. VII of the 1970 Illinois Constitution. Section 10(a) of that article provides in relevant part:

"Section 10. Intergovernmental Cooperation

(a) Units of local government and school districts may contract or otherwise associate among themselves, with the State, with other states and their units of local government and school districts, and with the United States to obtain or share services and to exercise, combine or transfer any power or function, in any manner not prohibited by law or by ordinance."

The constitutional-convention committee-of-the-whole debates on that section appear in Volume IV, pp. 3421-3431 of the Record of Proceedings, Sixth Illinois Constitutional Convention. At page 3421 of those debates Mr. Stahl stated that this section "permits smaller units of local government, by combining to perform specific services or functions, to develop economies of scale with resultant cast [*sic*] reductions." Mr. Wenum states on page 3423 that:

"What is anticipated here is not so much that there would be a specific transfer of any funds to another entity as such, but that there would be a joint venture which would be on a—probably the most rational way would be on a per capita basis—a joint funding and administration of some operation to the advantage of both of the operating units, but without necessarily a physical or paper transfer of monies from one treasury to the treasury of the other unit, but simply an apportioning of the costs of this cooperative venture."

The report of the local government committee on section 10 (then referred to as section 11) indicates a similar intent. On pages 173 and 174 of that report it is stated:

"The purpose of this proposed new section is to provide maximum flexibility to units of local government in working out solutions to common problems in concert with other units of government at all levels, 'in any manner not prohibited by general law.' Paragraph 11.1 will permit multi-unit endeavors in all areas of local concern. In addition, contractual relationships such as the sale of water to seventy-two suburbs by the City of Chicago, or the so called Lake-

wood Plan in Los Angeles County, California, will be constitutionally permitted instead of being dependent upon statutes * * * To this end, participating units will be allowed * * * to share in the operating and other costs of intergovernmental activities." On page 175 it is stated that "Intergovernmental cooperation is the voluntary participation of units of local government in joint undertakings * * * Intergovernmental cooperation generally takes one of three basic forms in which: * * * (2) *two or more local governments perform a function jointly or operate a facility on a joint basis.*" (Emphasis added.) Furthermore, the official text and explanation in Volume VII, p. 2730 of the Record of Proceedings, Sixth Illinois Constitutional Convention states that section 10 "* * * permits governments at all levels to cooperate in working out common problems. Thus, one local government can contract with another government * * * to share services and divide the cost equitably."

■■ Thus Dillon's Rule of strictly construing legislative grants of authority to local governmental units has been abrogated by section 10 of Article VII of the 1970 Constitution when local governments voluntarily cooperate to share services on a partnership or joint venture basis. Nevertheless, we find no such joint venture here. The townships are under no contractual obligation to purchase *any* gravel from Clark County. They have not combined with the county to perform or share specific services or functions. There is no joint funding and administration of the gravel pit operation. There is no agreement for the joint operation of the facility. There is no apportioning of the costs of any cooperative venture. Isolated purchases, from time to time, cannot be said to fall within the purview of section 10, Article VII of the 1970 Constitution or chapter 121, section 1—102.

Plaintiffs also argue that the county may not expend state motor fuel tax funds for the operation of a gravel pit. We do not agree. Ill. Rev. Stat. 1971, ch. 121, sec. 5—701.3 provides that "Any county board with the approval of the Department [of Public Works and Buildings] may also use motor fuel tax money allotted to it for the maintenance of any county highway * * *." Sec. 5—601 established that the operation of a gravel pit is a proper county function for the maintenance of its roads. It also appears that the Department had given its specific approval to the use of such funds for a gravel pit operation since its inception. Therefore, the use of state motor fuel tax funds in operating the gravel pit is within the statutory authority granted by 5—701.3.

The trial court's finding that the county may operate a gravel pit for its own use, and that its use of motor fuel tax funds for such a purpose was statutorily authorized is affirmed.

The trial court's finding that the county was authorized to sell gravel from the pit to other governmental units is reversed. The cause is remanded for further proceedings not inconsistent with the views herein expressed.

Affirmed in part, reversed in part, and remanded with directions.

SMITH, J., concurs.

Mr. PRESIDING JUSTICE CRAVEN dissenting in part and concurring in part:

I agree with that portion of the opinion holding that Clark County may own and operate a gravel pit. Indeed, the plaintiff admits on appeal, contrary to his position below, that the county does have express power to purchase, own and operate a gravel pit for its own highways and has authority to levy taxes to purchase or lease a gravel pit. This is, in fact, not a concession because such is the statutory provision. Ill. Rev. Stat. 1971, ch. 121, par. 5—601.

The majority opinion holds that the county has no authority to sell the gravel from its legally owned or leased pit to other governmental units, specifically townships, on a pro rated cost basis. With that portion of the opinion I do not agree. It seems to me that there is express statutory authorization for this and further the rules of construction relied upon in the majority opinion are, I believe, no longer applicable to units of local government.

The Illinois Highway Code contains an expression of legislative intent including the declaration that the development of a highway transportation system requires the cooperation of state, county, township and municipal highway agencies on a continuous and partnership basis, and the Highway Code is clearly designed to accomplish that intent. (Ill. Rev. Stat. 1971, ch. 121, par. 1—102.) The county board has general supervisory powers over all county, township and district highways as those terms are defined in the Highway Code and may levy taxes and expend funds for *those* highway purposes. (Ill. Rev. Stat. 1971, ch. 121, par. 5—101.2.) The county board in its discretion is authorized to appropriate funds to aid in the construction of township and district highways in any part of the county. (Ill. Rev. Stat. 1971, ch. 121, par. 5—101.4.) Construction is defined to include all things necessary to build, rebuild, or improve a highway. (Ill. Rev. Stat. 1971, ch. 121, par. 2—210.) Thus, it seems to me by the express language of the statute the county is authorized to do that which the plaintiff sought to enjoin and now under the majority opinion succeeds in enjoining.

As noted, the statutory grant of power without any construction expressly and explicitly permits the county to do that which the plaintiff seeks to enjoin, including owning, operating a gravel pit and making gravel therefrom available for improvement of county, township or district roads.

If, however, it is concluded that the statutory language is not as express as I think it is, and the same must be construed, the rules of construction employed by the majority have no validity following the adoption of the 1970 constitution. The majority opinion succinctly states the heretofore well-established rule of statutory construction to the effect that units of local government, being creatures of the state, have only such powers as are expressly granted or as may be found by necessary implication. It has likewise been a rule that grants of power by implication will not be eagerly found by statutory construction. Such rule of construction, known as "Dillon's Rule", is stated in Dillon's work on *Municipal Corporations* (5th ed., Vol. I, sec. 237, p. 448). The Constitutional Convention took note of Dillon's rule and very clearly set out to abrogate that rule and to turn it around and to provide that units of local government would not be dependent upon legislative grants of authority in order to exercise governmental power. Rather they would have such power necessary and incidental to the performance of their governmental duties in the absence of a prohibition by law. Thus, section 10 of article VII of the Constitution of 1970 manifests such intent by providing:

> "(a) Units of local government and school districts may contract or otherwise associate among themselves, with the State, with other states and their units of local government and school districts, and with the United States to obtain or share services and to exercise, combine, or transfer any power or function, in any manner not prohibited by law or by ordinance. Units of local government and school districts may contract and otherwise associate with individuals, associations, and corporations in any manner not prohibited by law or by ordinance. Participating units of government may use their credit, revenues, and other resources to pay costs and to service debt related to intergovernmental activities."

The formative debates on this section of the constitution shed a great deal of light on the scope and impact of this section and article and its operation in abrogating "Dillon's Rule" on local government in Illinois. The principal debates on section 10 (then referred to as section 11) wherein the constitutional convention sat as a committee of the whole,

appear in Volume IV, pp. 3421-3431, of *Sixth Illinois Constitutional Convention*, "Record of Proceedings". It is appropriate that selected portions of those debates be set forth.

Delegate Stahl and delegate Wenum shepherded section 10 throughout the debates. Mr. Stahl in his opening remarks stated:

"Intergovernmental cooperation is an approach to problem-solving—problems which cross the boundaries of local government. The language which we are suggesting most importantly, we think, is self-executing in that it provides that intergovernmental cooperation may be undertaken 'in any manner not prohibited by general law.' This simply means that we are trying here to reverse the Dillon psychology, that is, the notion of most local governments that they may not undertake an activity unless they are specifically authorized to do it by an act of the General Assembly.

What is intergovernmental cooperation? Well, it is a voluntary participation to contract, to agree, to cooperate, to associate at all levels of government. We think that it is a workable alternative—and I would emphasize 'alternative'—to regional or metropolitan government. It permits smaller units of local government, by combining to perform specific services or functions, to develop economies of scale with resultant cast [*sic*] reductions.

We think, in the long run, that vigorous intergovernmental cooperation will reduce the need for special districts and will permit the provision of services which no single unit can provide.

I think the best reason for intergovernmental cooperation is summed up in the committee report on page 178, and I quote it to you:

'The committee does not view intergovernmental cooperation as a panacea. Rather, it is a means by which local units in urban and rural settings may work together in seeking a common goal, a desired level of service to their citizens at the lowest possible cost.'" Vol. IV, p. 3421.

In reply to delegate Garrison's statement that there is no provision in the Illinois state constitution of 1870, or the proposed constitution of 1970, which would not permit the legislature from granting units of local government similar powers as those sought to be created by article VII, section 10, Wenum noted that while this is true, it was beside the point. Wenum stated:

"What we are suggesting, however—and this has been done in a number of states—is that a constitutional grant—a clear grant

of authority to do this—across areas on a general basis would be a very good first step in creating a climate. Obviously necessary legislation is going to have to come along to supplement and to render more effective this device; but because of the history of rather piecemeal treatment in Illinois and because of the fact that this is a kind of thing that is in desperate need at this juncture, as the population grows and as we suburbanize to a much higher rate, the cooperation that we are addressing ourselves to becomes, really, an imperative." Vol. IV, p. 3424.

Mr. Parkhurst, a member of the local government committee summarized the basic theory of operation that section 10 was predicated upon when he stated:

"* * * You will notice that the language of the intergovernmental cooperation article is based upon an *affirmative grant of self-executing power,* as Delegates Stahl and Wenum have repeatedly pointed out, which, in essence, means that it's there unless it's prohibited by the General Assembly—by general law. So it's a provision that says, 'You can do it unless the General Assembly says you can't.'" Vol. IV, p. 3426. (Emphasis supplied.)

In summing up before the section was submitted to the committee as a whole for vote and prior to the voting on an amendment to said section that Mr. Stahl opposed, he stated:

"Very briefly, Mr. President. I think, without trying to respond to everything that—I think that the intent of the committee here is the precise reverse of what this amendment intends to do. We are trying to strengthen local government. We are trying to give them the initiative as the alternative to regional government. This is voluntary; this is permissive; nothing happens without the consent of each unit of local government in an intergovernmental cooperation. I would submit to you that Rockford must work with Beloit or both will lose their identity." Vol. IV, p. 3430.

Section 10, referred to as section 11 in the debate, was submitted to the committee of the whole, whereupon it was passed then forwarded to the committee on style and drafting. Vol. IV, p. 3431.

Later on in the debates, Mr. Parkhurst again referred to the section in question when he stated:

"Well, the point that Delegate Stahl raises—I hadn't thought about it before, but I think that it was clearly our intent that the intergovernmental cooperation section would have a distinction between units of government dealing among themselves by contract, which would be granted as a self-executing power unless

prohibited by law—to distinguish between that sort of situation and dealing with private corporations or individuals, which would have to be authorized by law." Vol. V, p. 4253.

Certain delegates expressed fear that section 10 would in effect give local government units a blank check; that this open-endedness of section 10 would result in an unfettered and unbridled discretion on the part of these units of government. The sponsors of this section assured the constitutional convention that this would not be the case. It was pointed out time and again that the state legislature could regulate the activity of these units of government via legislation. Mr. Stahl summarized the nature of this so-called open-endedness of section 10 and its ramifications, when speaking in support of the Mathias-Martin amendment to section 10 as follows:

"The Local Government Committee met and reviewed the additional sentence which was added on second reading, which my amendment proposes to delete. Those who attended that meeting unanimously agreed that that statement, 'when authorized by law, units of local government and school districts may contract and otherwise associate with individuals, associations, and corporations', that there was in that statement, possibly substantial possibility of misreading—if you will follow me very slowly here, that it could be read, 'when authorized by law, units of local government may contract with corporations.'

Now that may be interpreted to mean that if you wanted to lease a garbage truck, you would have to have an authorization from the General Assembly to do it, and that, of course, is completely counter to everything we have been trying to do in home rule.

I would also add that the original intent of this section was with regard to cooperation between units of government—school districts, sanitary districts, cites, villages, counties, et cetera— and on second reading this additional thought of involving also individuals, associations, and corporations was incorporated in.

Now, I think—at least, for myself—I'm not sure I can speak for the committee—I am more or less neutral on the Mathias and Martin amendment, but I do want this body to know that if it does not pass, then I feel and I believe that, in this instance at least, I represent the point of view of the Local Government Committee and will vigorously advocate my amendment to delete the sentence as it presently exists." Vol. V, p. 4445.

The Mathias-Martin amendment referred to by Stahl and his own amendment was succinctly explicated upon by Mr. Mathias. Mathias stated:

"Thank you. The proposal is that we strike the words 'when authorized by law' and begin the sentence with 'Units of local government,' and then that we add, at the end of the sentence, the words 'in any manner not prohibited by law or by ordinance.'

In other words, these units of local government and school districts could contract and otherwise associate with individuals, corporations—or associations and corporations—when not—in any manner not prohibited by law or by ordinance. This is the same authority that they have with respect to intergovernmental cooperation.

As it is now, they have to get prior legislative authority before they may do it. The amendment would permit them to go ahead on this cooperation in the private sector unless the legislature had prohibited them from doing it or unless it was prohibited by ordinance.

I think this makes it consistent. It gives these non-home rule units powers consistent with those of the home rule units, back under section 6. They can go ahead unless it is prohibited by the legislature.

I want to point out that from time to time you have different organizations, foundations, and others that make proposals to some of these non-home rule units, and they cannot go ahead unless they go back to the legislature and get authorization. They want to make certain improvements, and someone is going to share the cost; they cannot do it unless they have first gotten prior legislative authority.

Now I think we will have general legislative authority in certain areas; but there are many special areas that come up, and this would permit those non-home rule units to go ahead and make a contract, unless it was in an area that has been prohibited by legislative action. For that reason, we are proposing this amendment." Vol. V, p. 4444.

In support of the proposed amendment, Mr. Mathias, later on in the debates on said amendment, stated:

"I might give you just an instance or two of some things I have run into in my own experience. For instance, I had a city that was building a water line going some forty miles away, bringing in water from another area, and in coming through the certain farm lands as they have to, these individuals wanted to get water off of that line. The bond authorities raised the question as to whether or not the city had the right to furnish water to somebody out twenty miles away. What we had to do was write into the ease-

ments a provision that whereby, as the part of the consideration for the easement, they would furnish water to that individual.

And we all know of situations in which foundations wanted to make some agreement with some agency, and it isn't uncommon for someone to want police protection outside the agency or that sort of thing. They will furnish a fire truck, they will pay for the policeman, and that sort of thing. This would permit the non-home rule unit to go ahead and make that sort of an agreement, and unless the legislature has prohibited or has regulated it, they could go ahead and do it." Vol. V, p. 4445.

The proposed Mathias-Martin amendment was subsequently adopted and is found incorporated in section 10 of article VII.

Inasmuch as the county has statutory authority to expend the funds for township roads and inasmuch as local governmental units, including townships and counties, are authorized to associate among themselves in order to effectuate their governmental function so long as such is not prohibited by law, it seems to me that Clark County should be able to sell gravel on a pro rata cost basis to a township. Dillon's rule of statutory construction was, I believe, intended to be permanently interred by the adoption of section 10 of article VII of the constitution and its resurrection is to be regretted.