MARSHALL FIELD & CO., Plaintiff-Appellee, *v.* THE VILLAGE OF SOUTH BARRINGTON, Defendant-Appellant.

First District (2nd Division)    No. 80-2573

Opinion filed January 6, 1981.

Friedman & Koven, of Chicago (Donald J. Kreger, Rowe W. Snider, and Scott Peters, of counsel), for appellant.

Chapman & Cutler, of Chicago (James E. Spiotto and Ann Acker, of counsel), for appellee.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Plaintiff Marshall Field & Co. (Field) filed an action for declaratory judgment (Ill. Rev. Stat. 1979, ch. 110, par. 57.1) seeking a judicial determination of the validity of two resolutions of the defendant village of South Barrington's government to issue revenue bonds in order to finance the construction of Field retail facilities located in West Dundee and Bloomingdale, Illinois. Following submission of the initial pleadings, Field moved for summary judgment. Both parties filed briefs, and the trial court granted Field's motion, declaring the proposed bond issues to be consonant with the Illinois Constitution and State law.

South Barrington appeals that finding, asserting two bases upon which the trial court allegedly should have invalidated the bond isues: (1) that South Barrington exceeded its constitutionally granted home-rule authority in undertaking these particular bond proposals; and (2) that the financing scheme lacked the constitutionally required public purpose.

The substantive facts presented in the record to the trial court and this court are of minimal quantity. Due to the outcome of the proceedings below, they are derived entirely from the pleadings and motions of the parties and are "undisputed."

South Barrington is a home-rule unit in accordance with provisions of the Illinois Constitution. (Ill. Const. 1970, art. VII, §6.) On January 17, 1980, South Barrington adopted two resolutions which stated the village's intent to market two revenue bond issues not exceeding $9 million each for the purpose of financing the construction of Field retail facilities in the villages of West Dundee and Bloomingdale. Included in the resolutions were the following findings: (1) that the bond financing was necessary to insure the completion of the facilities,[1] and (2) that the financing arrangements would "promote and further public purposes." Incorporated into the resolutions were memoranda of agreement between the village and Field. Among the representations therein were a restatement that the arrangements served the public purposes, a notation that Field wished to begin construction of the facilities only after "satisfactory assurances" that the proposed financing would be available, and an agreement that South Barrington would "* * * cooperate with the Company [Field] to endeavor to find a purchaser or purchasers for the bonds, and * * * will adopt such proceedings and authorize the execution of such documents as may be necessary or desirable for the

---

[1] It appears from findings made in the record and representations made at oral argument that Field had acquired the land and commenced construction of the two facilities prior to the adoption of these financing resolutions.

authorization, issuance and sale * * * all as shall be authorized by law and mutually satisfactory to the Issuer and the Company." Also agreed to were that Field would be responsible for payment of the principal, interest, and premium on the bonds, and that the two projects together would result in 625 new jobs.[2] Parenthetically, we note that the record under consideration contains no additional documents referred to in the memoranda, nor does it contain copies of the bonds intended to be issued. Rather, the information on these matters comes to us solely from the resolutions and appended memoranda.

At the time these writings were entered into, neither West Dundee nor Bloomingdale was a home-rule unit under the provisions of the constitution.

On June 20, 1980, South Barrington's corporate counsel notified Field that the village would not proceed with the bond issues because of questions as to their legality. The problems set forth are identical to those raised on this appeal. Faced with this position of South Barrington, Field instituted this action.

I

South Barrington contends that the proposed bond issues exceeded the permissible scope of its home rule authority as granted by the constitution. It is argued that the funding by a home rule unit of a commercial facility located within the corporate boundaries of another municipality which is not a home rule unit does not "pertain to the government and affairs" of South Barrington, the home rule unit, as required by the constitution.

Prior to the adoption of the 1970 Constitution, the power and authority of municipal entities were governed by what is commonly referred to as Dillon's Rule:

> [A] municipal corporation possesses and can exercise the following powers, and no others: First, those granted [in legislative delegation] in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the accomplishment of the declared objects and purposes of the corporation * * *." (1 Dillon, Law of Municipal Corporations §237, at 449 (5th ed. 1911).)

(See *Ives v. City of Chicago* (1964), 30 Ill. 2d 582, 585, 198 N.E.2d 518.) Thereunder, legislative grants of authority by the State to local governmental units were to be strictly construed. See *Connelly v. County of Clark* (1973), 16 Ill. App. 3d 947, 949, 307 N.E.2d 128.

■■ The 1970 Constitution radically altered this relationship of munici-

---

[2] This last representation appears to be the sole basis for the determination that the bond issues served the public purposes.

palities to the State by introducing the concept of home rule. "Except as limited by this section, a home rule unit may exercise any power and perform any function *pertaining to its government and affairs* * * *." (Emphasis added.) (Ill. Const. 1970, art. VII, §6(a).) The terms of this grant of power to home rule units are broad and imprecise; however, the qualifying language emphasized above was clearly intended as a limit upon that power. It is for the judiciary to determine how extensive this limitation is to be. See *County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494, 508-09, 389 N.E.2d 553; *Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537, 540, 338 N.E.2d 15.

In determining the extent of home rule power as intended by the framers of that provision (and therefore in determining the scope of the limiting language on that grant of power), the following statement of the Local Government Committee to the sixth constitutional convention, which wrote the provision, is instructive.

> "It is clear, however, that the powers of home-rule units *relate to their own problems*, not to those of the state or the nation. * * * Thus the proposed grant of powers to local governments extends only to matters 'pertaining to their government and affairs.' * * * Perhaps the provision which is closest to the proposed language is a draft prepared for Arkansas which reads as follows: 'A munici-pality may exercise any legislative power pertaining to its local municipal affairs [* * *].' The intent of this draft, as in the Committee's proposal, is to give broad powers to deal with local problems to local authorities * * *." (7 Record of Proceedings, Sixth Constitutional Convention 1621-22 (Proceedings), cited in part in *Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537, 540.)

In order to assess the constitutionality of South Barrington's proposed activity, then, we must determine whether a home rule unit which intends to finance the construction of (a) a commercial facility which is not only (b) outside of its own boundaries but is also (c) within the corporate limits of another municipality is acting upon matters which sufficiently pertain to its government and affairs so as to be adjudged a valid exercise of home-rule power.

The constitution itself does not *explicitly* indicate whether the home-rule authority granted therein may be exercised by a municipality outside of its corporate limits. Noteworthy on this question is a review of the evolution of the present local government article (article VII) during the sixth Illinois constitutional convention. As originally submitted, the pro-posed article on home rule power stated that any eligible unit could "* * * *within its corporate limits,* exercise any power and perform any function pertaining to its government and affairs * * *." (Emphasis added.) (See 7 Proceedings 1577-78.) After some debate as to the

desirability of this emphasized language (see, *e.g.*, 4 Proceedings 3038-41), the proposal was adopted and referred to the Committee on Style, Drafting and Submission. This committee deleted the emphasized terminology without explanation. (See 7 Proceedings 1987, 1990.) No discussion of this change was undertaken by the convention delegates upon the second reading. The provision was finally adopted in this altered form. See 7 Proceedings 2646; 5 Proceedings 4528; Anderson & Lousin, *From Bone Gap to Chicago: A History of the Local Government Article of the 1970 Illinois Constitution*, 9 J. Mar. J. Prac. & Proc. 698, 747-48 (1976).

From this "legislative history" of the provision, we conclude that the framers did not intend to limit home-rule power solely to activities to be undertaken within the unit's boundaries.[3] Therefore, if such a limitation is to be assigned in this case, it must be found either from an explicit and specific legislative restriction enacted pursuant to sections 6(g) and (h) of article VII of the constitution (Ill. Const. 1970, art. VII, §6(g), (h)), or by implication from the "pertaining to" requirement of the constitution. See *City of Evanston v. Create, Inc.* (1980), 84 Ill. App. 3d 752, 756, 405 N.E.2d 1350, *appeal allowed*; Baum, *A Tentative Survey of Illinois Home Rule (Part I): Powers and Limitations*, 1972 U. Ill. L.F. 137, 154-56.

We have not been referred to nor have we discovered any legislative enactment pursuant to the just cited constitutional provisions which seeks to place such a territorial limitation on a home-rule unit's power to raise financing through the issuance of revenue bonds. To the contrary, there exists an implicit legislative statement in the Industrial Project Revenue Bond Act (hereinafter "the Act," found at Ill. Rev. Stat. 1979, ch. 24, par. 11—74—1 *et seq.*) to the effect that such activity is permissible. In the Act, the legislature has granted non-home-rule units the power to use revenue bonds to finance certain specified projects within 10 miles of their borders. (Ill. Rev. Stat. 1979, ch. 24, par. 11—74—4(1).) The supreme court has determined that home-rule units possess this capacity as well, not under the explicit terms of the Act, but under the Constitution's grant of home-rule power in article VII. (*People ex rel. City of Salem v. McMackin* (1972), 53 Ill. 2d 347, 365, 291 N.E.2d 807.) The supreme court indicated that the precise procedures would be left to the determination of the home rule unit. Since the *McMackin* decision, the legislature has not acted to remove this power of home rule units found therein. To the contrary, the legislature has recently amended the Act by expanding the scope of financing power available thereunder. (Ill. Rev. Stat. 1979, ch. 24, par. 11—74—4, as amended by Pub. Act. 81-1376, eff. Aug. 9, 1980.)

---

[3] For a contrary review, see Justice Shaefer's dissent in *People ex rel. City of Salem v. McMackin* (1972), 53 Ill. 2d 347, 291 N.E.2d 807.

The general conclusion drawn from the amendment of a statute without alteration of the previously construed terms is that the legislature intended to adopt the prior judicial construction given the statute. (*Hupp v. Gray* (1978), 73 Ill. 2d 78, 85-86, 382 N.E.2d 1211, 1A Sutherland, Statutes & Statutory Construction, par. 22.35 (4th ed. 1972).) Since the *McMackin* holding must stand for the proposition that such activity as is possible thereunder pertains to the acting body's government and affairs (elsewise it could not be a constitutional exercise of home rule power), we must conclude that, under *McMackin*, South Barrington would be capable of issuing revenue bonds to finance at least those types of projects specified in the Act, if the projects were located within 10 miles of its boundaries.

■■ We note that the version of the Act in force at the time South Barrington adopted the resolutions did not allow for the financing of commercial facilities under its provisions. Thus, *McMackin* cannot directly support a ruling that South Barrington was empowered to act as planned here. Nonetheless, we do not believe that this circumstance requires that we reject the South Barrington plan. We have discovered no constitutional or legislative restrictions precluding a home-rule unit (as opposed to a non-home-rule unit) from financing a commercial, rather than industrial, operation within 10 miles of its border. We believe that such a scheme would pertain to the financing municipality's government and affairs as equally as did the arrangement approved in *McMackin*. Further support for this conclusion comes from the legislature's action in amending the Act to encompass the financing of commercial ventures by non-home-rule units. (Ill. Rev. Stat. 1979, ch. 24, par. 11—74—4, as amended.) Therefore, we extend the underlying rationale of *McMackin* to cover the financing of a commercial operation by a home-rule body within 10 miles of the financing unit's boundaries just as the amended Act now allows a non-home-rule unit to do.

There remains the question of whether such activity is legal when the facility's location is within the 10-mile limit but also within the territorial boundary of another, non-home-rule unit. We have not been presented with any constitutional or legislative proscription of such a financing scheme. South Barrington cites numerous cases in an effort to argue that this type of financing arrangements does not pertain to the government and affairs of the bond issuer. (See, *e.g.*, *People ex rel. Lignoul v. City of Chicago* (1977), 67 Ill. 2d 480, 368 N.E.2d 100; *City of Des Plaines v. Chicago & Northwestern Ry. Co.* (1976), 65 Ill. 2d 1, 357 N.E.2d 433.) We find those cases distinguishable. There, the problems sought to be acted upon under the grant of home-rule power were found to concern the region or State more than the specific local interests of the home-rule body. Here, in contradistinction, the supreme court in *McMackin* has, by

approving revenue bond financing as envisioned by the Act for home-rule units, effectively ruled that such concerns do pertain to local interests. Additionally, the facts before us do not indicate the alleged contravention of the constitutional distinction between home rule and non-home-rule units which South Barrington perceives as being the result of the action it initially proposed here. West Dundee and Bloomingdale are essentially passive entities under the South Barrington plan. They are to take no part in administering the bond issues, have no direct financial concern, and, as we perceive the record, have done nothing more than acquiesce in the proposed financing scheme. No municipal power of any consequence is being either utilized by or usurped from these situs communities. Therefore, in view of the constitution's mandate that its grant of home rule authority is to be liberally construed (Ill. Const. 1970, art. VII, §56(m)), we are of the considered opinion that the proposed bond issues of South Barrington are based upon a valid exercise of that municipality's home rule power.

## II

### A

As a second and separable basis for declaring the bond issues invalid, South Barrington asserts that the financing scheme fails to serve the public purposes as is required by the constitution. Specifically, South Barrington argues that Field was not "induced" to locate and build in West Dundee and Bloomingdale by the financing arrangement, thereby rendering any economic benefit which would nominally be seen as a public purpose incidental to the private gains realized by Field.

The constitution mandates that public funds, property, or credit be used solely for public purposes. (Ill. Const. 1970, art. VIII, §1(a).) The determination of whether a proposed public expenditure serves the public purposes is initially to be made by the legislative body empowered to expend the funds. Such a legislative decision is not to be lightly set aside upon judicial review. However, a self-serving recitation that the public purposes are served is not conclusive of that question. (*People ex rel. City of Salem v. McMackin* (1972), 53 Ill. 2d 347, 354-55, 291 N.E.2d 807; see also *Perkins v. Board of County Commissioners* (1916), 271 Ill. 449, 466, 111 N.E. 580.) The courts look to the goals sought by and the actual effects of the expenditure of the public funds in deciding the issue. (*People ex rel. McDavid v. Barrett* (1939), 370 Ill. 478, 481-82, 19 N.E.2d 356.) The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classified as involving a public purpose, especially in the area of economic welfare. *People ex rel. City of Salem v. McMackin* (1972), 53 Ill. 2d 347, 356.

## B

■■ Field's initial response to this contention is an assertion of the doctrine of estoppel. According to Field's argument, South Barrington should be estopped from refuting its original legislative finding that the proposed bond issues serve the public purposes. In other circumstances, this theory has been deemed meritorious, most often where a bona fide holder of already issued bonds is seeking payment on them from the issuer, who then attempts to deny a prior representation as to the legality of the bonds. (See, *e.g.*, *Township of Harter v. Kernochan* (1881), 103 U.S. 562, 26 L. Ed. 411, *Hackett v. City of Ottawa* (1879), 99 U.S. 86, 25 L. Ed. 363.) We find the present situation to be distinguishable. Both *Harter* and *Hackett* appear to turn upon the fact that the bonds there contained representations *on their face* that they complied with the law, and such representations were likely to foster reliance thereupon by a bona fide purchaser. In contrast, here no bonds have issued and therefore no bona fide purchaser exists. Field has not directed its financial resources, as a purchaser would, into the hands of the bond issuer with the expectation that repayment would eventually be forthcoming as specified in the transaction. We do not believe that the policy behind the estoppel doctrine found in the bona fide purchaser cases extends to such circumstances.

There is, further, another reason to reject the estoppel argument. If the proposed bond issues here were found to lack a valid public purpose, they would be void under the constitution. (Ill. Const. 1970, art. VIII, §1(a).) South Barrington has no power to issue revenue bonds lacking in this requisite public purpose. In such a situation, no recitals of law or fact made by a legislative body are available to work an estoppel as to the validity of that particular attempted exercise of governmental power. (*Newberry Library v. Board of Education* (1945), 390 Ill. 48, 63, 60 N.E.2d 552.) The estoppel doctrine cannot be used to validate a void bond proposal. (See McQuillin, Municipal Corporations §43.74 (3d ed. 1970).) Although South Barrington's action is inconsistent, we do not believe that the estoppel doctrine should be applied to the particular facts present here.

## C

■■ Turning to the "inducement test" offered by South Barrington as a basis for a finding that the public purposes are lacking in the proposed bond issues, we are directed to the language of several cases from Illinois and out-of-state. These cases purportedly state that unless a private beneficiary of a public bond issue has been "induced" to locate, build, expand, or remain within an area by the availability of that type of financing, the actual benefit therein is received by the private party, and any public

benefits which do result are merely incidental to those of a private nature, thereby rendering the financing scheme contrary to the constitution.

We have carefully read the cases cited by South Barrington in support of this theory. Nothing that we find in the language of *McMackin* or *People ex rel. City of Urbana v. Paley* (1977), 68 Ill. 2d 62, 368 N.E.2d 915, indicates that our supreme court believed that an "inducement" must be shown before a bond issue similar to that envisioned here could be adjudged valid. The broad statements found in those cases are better seen as merely generally approving the expenditure of public funds to foster increased economic activity. [4] We further find *People ex rel. Scott v. Chicago Park District* (1976), 66 Ill. 2d 65, 360 N.E.2d 773, to be distinguishable. That case involved the so-called public trust doctrine, and the court ruled that the benefits of increased employment were outweighed by the loss of land under the public trust which was to be conveyed to the private business interest to create the additional jobs. Finally, the Kentucky case of *Manning v. Fiscal Court of Jefferson County* (Ky. 1966), 405 S.W.2d 755, is also distinguishable. There, the bond issue was to be used to acquire an already existing industrial plant. The financing scheme had "no influence" on the decision of the business to locate, no increased employment would result, and the practical effect of the bond issue would simply be the substitution of public financing for private money. In sum, we do not find sufficient authority to support adoption of the test proposed by South Barrington in any set of circumstances.[5] As to the particular situation presented here, we decline to adopt such a doctrine.

## D

There yet remains the question of whether the trial court erred in implicitly [6] ruling that the proposed bond issues serve the public purposes.

---

[4] As an aside, it should be noted that in *McMackin*, the supreme court stated that "[t]he only constitutional prohibition [against the use of public funds] is against the State contracting debts as a guarantor or surety and, in essence, loaning its credit to others [citations]." (*McMackin*, 53 Ill. 2d 347, 359.) This language could conceivably be understood to invalidate the very arrangements which the supreme court approved in ruling the Act to be valid. We note, however, that this language is based upon article IV, §20 of the 1870 Constitution (Ill. Const. 1870, art. IV, §20). That provision has been replaced by the broader "public purposes" language of the 1970 Constitution (Ill. Const. 1970, art. VIII, §1). The 1970 Constitution was in effect at the time the *McMackin* opinion was issued. We are therefore of the opinion that in this case it is premature to consider the quoted terms found in *McMackin*. Such language should be considered in relation to the revenue bond ordinance to be adopted by South Barrington and the financing agreement between Field and South Barrington.

[5] See, *e.g.*, *Wilson v. Board of County Commissioners* (Md. App. 1974), 273 Md. 30, 327 A.2d 488.

[6] The trial court did not explicitly find that the proposed bond issues furthered public purposes, instead ruling that they were "in accordance with the Constitution and Laws of the State of Illinois and are valid, proper and binding ° ° °."

As the appellant in this case, South Barrington bears the onus of demonstrating that its initial legislative finding on this question was erroneous. In neither the record before this court, which we have exhaustively examined, nor in the representations of the parties made in response to our inquiries at oral argument, have we found a *factual* basis for setting aside South Barrington's legislative determination. Rather, we see the minimal amount of factual material relevant to this matter as being insufficient to overcome the deference given to that legislative declaration. Therefore, we are constrained to accept the legislative judgment made by the village on this question, and we affirm the decision of the trial court which ruled that the proposed financing scheme was proper under Illinois law.

### III

As a final note to this decision, we make this *caveat*. Our determination that the trial court did not err in finding the issues to be consonant with the law is made solely because we have been presented with nothing of record to warrant an exception to the traditional judicial deference to be given to legislative determinations on such matters. We are not in any manner rendering a broad decision approving of such undertakings as proposed here in all circumstances. The record before this court is wholly lacking in the specifics of the revenue bond issues and the financing agreements. Therefore, our decision does in no way foreclose later judicial scrutiny when those facts become apparent, should such scrutiny be required. Today's decision merely approves and is limited to the actions of South Barrington as evidenced in the record before us.

For the above reasons, the decision of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS and PERLIN, JJ., concur.