**LG & E ENERGY MARKETING, INC., Plaintiff,**

v.

**CITY OF SPRINGFIELD, ILLINOIS, CITY WATER, LIGHT AND POWER COMPANY, Defendant.**

No. 3:98–CV–485–H.

United States District Court, W.D. Kentucky, at Louisville.

Oct. 6, 1999.

Susan J. Mohler, Brown, Todd & Heyburn, Lexington, KY, Carl A. Henlein, Arthur S. Beeman, Brown, Todd & Heyburn, Louisville, KY, for plaintiff.

Victor B. Maddox, Tachau, Maddox, Hovious & Dickens, Louisville, KY, Michael A. Feagley, John M. Carroll, Mayer, Brown & Platt, Chicago, IL, C. Clark Germann, Thomas H. Wilson, Sorling, Northup, Hanna, Cullen & Cochran, Springfield, IL, for defendant.

## MEMORANDUM OPINION

HEYBURN, District Judge.

Spurred by federal deregulation of the power utility industry, a nationwide market for wholesale electrical energy now exists. This case involves a daily option call agreement under which Plaintiff LG & E Energy Marketing, Inc. ("LG & E") could purchase such wholesale electrical energy from Defendant City of Springfield, Illinois, City Water, Light and Power Company ("Springfield"). LG & E has sued Springfield for both breach of contract and fraud in the inducement to contract.

Illinois municipal governments, like the state itself and the federal government, are of limited powers. Thus, Springfield's actions and obligations are limited to those outlined in the Illinois Constitution and statutes. With commendable skill and as its front line of defense to the complaint, Springfield argues that the Illinois Constitution's public purpose clause, the Illinois Public Funds Investment Act, and the Illinois Municipal Code each deny it the power to trade in options for electricity as part of a profit-making venture. If Springfield's arrangements were *ultra vires* on any of these grounds, any contracts would be void and unenforceable. The various competing motions for partial summary

judgment require an answer to each of these issues.

## I.

The facts relevant to Springfield's *ultra vires* defenses are not in dispute. On February 1, 1996, LG & E and Springfield entered into an Interchange Agreement, which established an ongoing relationship between the parties. The Interchange Agreement was not itself a contract for the sale and purchase of energy, but established a framework for energy trading: All future transactions between the parties were to stem from and be controlled by it. On March 6, 1996, Springfield's City Council approved the Interchange Agreement in an official city ordinance, stating that "this service will open opportunities for [Springfield] to purchase and sell wholesale electric energy with others beyond the utility's directly interconnected neighbors on a cost competitive basis."

Operating in this framework, on September 1, 1997, LG & E and Springfield contracted for a daily call option. In exchange for LG & E's premium payment of $409,600, Springfield granted LG & E the option to purchase a finite number of megawatt-hours of electricity on each non-holiday weekday at a price of $50 per megawatt-hour. This daily call option would last until August 31, 1998. Springfield could provide the energy at any "Cinergy border," meaning that it could provide energy produced at its own plants, send energy produced elsewhere and flowing through Springfield, or arrange for energy to be sent directly from plants elsewhere in the United States without Springfield ever physically creating or handling the energy. Springfield had its own energy production plants capable of manufacturing a certain amount of energy every day. Thus, under this option agreement, the daily calls could be filled by either "touch" or "no-touch" transactions. Springfield's failure to provide energy in response to a daily call was subject to liquidated damages. Springfield's City Council did not issue an ordinance approving this specific transaction, but it did consent to the buying and selling of options generally, as discussed below.

At the time LG & E and Springfield contracted for this year-long daily call option, Springfield had similar daily call obligations with other municipal and private utilities and energy marketers. In a mirror image of its daily call option with LG & E, Springfield contracted for its own daily call option to purchase the same finite amount of energy for the same megawatt-hour price from Federal Energy Sales, a private energy marketer. Springfield paid a $389,120 premium for this option. Viewed as a matched whole, Springfield would make $20,480 on the two transactions, that being the difference in the price it paid Federal for its option and the price LG & E paid for its option.

Springfield's sanctioning of these wholesale electric power contracts seems not to be in dispute. Excess capacity at a utility's power plants is inevitable, and Springfield readily admits that it "seeks to sell excess power to other utility systems through the wholesale electric market," because "such sales help maintain low electric rates for its regular customers." In its Fiscal Year 1998 Annual Appropriation, Springfield vowed to "actively pursue profitable sales of excess power on the wholesale electricity market and power marketing transactions to help maintain low rates for CWLP's retail customers" and to "monitor, plan for and adapt to changes in the electric utility industry brought about by the deregulation of investor-owned utilities and increased competition for customers."

Springfield also made an explicit policy of buying and selling electricity that was neither generated by Springfield plants nor intended for use by Springfield customers. This policy existed in the form of two city ordinances. Springfield's City Council passed the first of these, Ordinance No. 8777, on July 1, 1997. That ordinance appropriated over $6 million for, inter alia, purchased power, some of which would be sold to third parties. As evi-

denced by the fact sheet for that ordinance, Springfield purposely entered these third party sales:

> Activity in the wholesale power market, sales to other utilities and power marketers, is projected to exceed the expectations that [Springfield] incorporated in its original Fiscal Year 1998 Budget. Opportunities exist to sell more power from [Springfield] generating plants *as well as to resell power purchased from other power marketers.*
>
> . . .
>
> [Springfield] has implemented a power marketing function within the Electric Operations Department at the Dispatch Center. In addition to selling power generated by [Springfield] plants, *it is also possible in today's wholesale power market to buy power from another utility or power marketer, add a margin, and re-sell it to another party without the power ever physically touching the [Springfield] system.* These power marketing efforts require no fuel expense and no plant maintenance expense on the part of [Springfield]. However, *such transactions, which are called "third party purchases for resale," do require a budget amount for the purchased power that will be resold. This expense will be covered by the revenues earned on the resale. Power will only be purchased in this manner if [Springfield] can recognize a gain on the resale.*

Ordinance Fact Sheet for Ordinance No. 8777 (First Reading June 17, 1997) (emphasis added).

Springfield passed another ordinance on February 17, 1998, that specifically approved buying and selling options to power marketers with which Springfield had interchange agreements (i.e., options such as the LG & E daily call options). Pursuant to Ordinance No. 9004, these options were intended for use "as a risk-management tool to cover its physical commitments in the wholesale electricity marketplace." In the ordinance's fact sheet, Springfield defended the purpose of the options:

> This authority would enable the utility to more economically meet its native load *and contractual requirements. In the dynamic and competitive wholesale electricity marketplace today, it is imperative that the utility have the same tools as others to manage risk, reduce costs, and maximize revenues.*

Ordinance Fact Sheet for Ordinance No. 9004 (First Reading Feb. 17, 1998) (emphasis added). Thus, specific authority to enter options contracts was granted, albeit six months into the LG & E options contract.

For the first nine months of the daily call option contract, LG & E exercised its option on eight separate occasions. Each time, Springfield satisfied LG & E's daily call. In late June, 1998, however, energy prices skyrocketed. On June 24, 1998, LG & E once again exercised its option by making a daily call. When Springfield was unable to meet this call (apparently, Federal Energy Sales failed to provide Springfield with reciprocal amounts of energy), Springfield formally refused to satisfy any more daily calls by LG & E. This lawsuit followed shortly afterwards.

The Court will consider each of the *ultra vires* defenses in turn.

## II.

The Illinois Constitution, Article VIII, § 1(a) provides that "[p]ublic funds, property or credit shall be used only for public purposes." Springfield contends that, by engaging in a scheme of buying and selling daily call options for energy, Springfield violated this provision. Springfield admits that generating energy serves a public purpose, as does the sale of excess energy and the purchase of needed energy. But Springfield argues that the sale of an option to buy energy is no different from investing public money in any futures market for commodities, an act that they claim is outside the scope of "public purpose." LG & E refutes this argument, contending that the daily call option serves the public purposes of securing an outlet for excess

manufactured energy and engaging in full participation in the modern market for wholesale electric energy. Thus, LG & E balks at the analogy to abstract trading in stocks or futures.

■ This is a question of first impression under the Illinois Constitution.[1] Because Illinois's courts have not addressed the issue, the Court must anticipate or predict how the highest Illinois court would rule if confronted with the issue. *See Bailey Farms, Inc. v. NOR–AM Chemical Co.*, 27 F.3d 188, 191 (6th Cir. 1994); *Mills v. GAF Corp.*, 20 F.3d 678, 681 (6th Cir.1994). In the absence of controlling state law, the Court's prediction must be based on "pertinent or analogous legal principles, policies, precedents, and doctrinal trends embraced by its appellate courts." *Rousey v. United States*, 115 F.3d 394, 397 (6th Cir.1997).

■ After reviewing Illinois cases that apply the constitutional provision at issue, the Court predicts that Illinois would not find the daily call option contract beyond the powers granted by its Constitution. The policy of Article VIII, § 1(a) focuses upon the *prevention* of the use of governmental funds, property, or credit by or on behalf of or for the benefit of *private* persons or enterprises. *See, e.g., In re Marriage of Lappe*, 176 Ill.2d 414, 223 Ill.Dec. 647, 680 N.E.2d 380, 391–92 (1997) (constitutional provision contrasts public purpose with benefits to private interests); *City of Rolling Meadows v. National Advertising Co.*, 228 Ill.App.3d 737, 170 Ill. Dec. 662, 593 N.E.2d 551, 558 (1991) ("Public funds cannot be devoted to a purely private purpose."); *Marshall Field & Co. v. Village of South Barrington*, 92 Ill.App.3d 360, 47 Ill.Dec. 964, 415 N.E.2d 1277, 1283–84 (1981) (focusing constitutional inquiry on receipt of actual benefits by private parties); *O'Fallon Dev. Co. v. City of O'Fallon*, 71 Ill.App.3d 220, 27 Ill.Dec. 613, 389 N.E.2d 677, 681–82 (1979) (logo of privately-owned shopping center painted on municipal water tower was uncompensated advertising and a purely private use of public property). In fact, Illinois's courts have determined that the constitutional provision "was 'intended explicitly to reaffirm the general rule that public monies cannot be taken or applied for private purposes but can only be applied to public purposes.' " *Ziebell v. Board of Trustees of the Police Pension Fund of the Village of Forest Park*, 73 Ill.App.3d 894, 29 Ill.Dec. 544, 392 N.E.2d 101, 105 (1979) (*quoting* 2 Record of Proceedings, Sixth Illinois Const. Convention 869 (statement of Delegate Cicero)).[2] An incidental or minor benefit to private interests is not sufficient to render unconstitutional an act whose principal purpose is public in nature. *See People ex rel. City of Salem v. McMackin*, 53 Ill.2d 347, 291 N.E.2d 807, 812–13 (1972).[3]

Springfield had excess generation capacity and needed to sell it. The daily call could have been satisfied out of that excess capacity. The daily call options were intended to manage the risks inherent in maximizing revenues from the city's electrical generation capabilities while assuring the most reliable and cost effective supply of electricity. To be sure, using

1. The parties seem to have agreed that Illinois law applies to the issues of the case.

2. Examples of such allegedly private benefits are school busing for students at non-public schools, *see Board of Educ., School Dist. No. 142 v. Bakalis*, 54 Ill.2d 448, 299 N.E.2d 737 (1973), and child support enforcement services for non-AFDC recipients. *See Lappe*, 223 Ill.Dec. 647, 680 N.E.2d at 382–83.

3. The Court cannot find evidence that Illinois courts have attempted to regulate what is a usual and proper public concern as distinguished from a public purpose which is impermissible. The Court supposes that a municipality might engage in some profit-making scheme which is so disconnected from its normal operations and the use of its various municipal assets that an Illinois court would find those actions *ultra vires*. For instance, buying a seat on the commodities exchange and subsidizing the trading of pork bellies or some other unrelated commodity as Springfield suggests, might yield a different analysis. The Court finds our circumstances to be distinctly different from such hypotheticals.

public resources in this way could be viewed as risky and foolish.[4] However, Springfield's apparent motivation was to use an available asset—the ready supply of electricity—to lower utility bills for the city's regular customers. To do so did not confer a benefit on a private party. For all of these reasons, an Illinois court would likely conclude that the daily call option scheme had a public purpose and benefit as defined by the Illinois constitution.

Springfield seems to have thought the option sale plan to have a public purpose. Its own public ordinances suggest as much. Illinois courts would certainly consider these contemporaneous expressions of legislative purposes. *See Marshall Field,* 47 Ill.Dec. 964, 415 N.E.2d at 1284; *see also Lappe,* 223 Ill.Dec. 647, 680 N.E.2d at 388; *Salem,* 291 N.E.2d at 814. Springfield repeatedly asserted the public benefits of selling daily call options in its municipal ordinances. Indeed, the City Council considered it "imperative that the utility have the same tools as others to manage risk, reduce costs, and maximize revenues." This is virtually a legislative admission that daily call options were an integral part of the modern wholesale electricity market.[5] The asserted goals of options trading—risk management, cost reduction, and revenue maximization—all served the public purpose of operating a power generation company for provision of electricity to Springfield's constituents at the lowest possible cost.[6]

The options contract was intended to serve a number of legitimate public purposes. No benefit accrued to any private party. Consequently, the Court finds that the daily call option agreement meets the public purpose requirement of Article VIII, § 1(a), and Springfield's constitutional *ultra vires* defense must fail.

### III.

The Illinois Public Funds Investment Act ("IPFIA") authorizes public agencies to "invest any public funds" in a discrete list of investments. *See* 30 Ill. Comp.Stat.Ann. 235/2(a) (West 1999). Buying or selling options is not listed

4. Everyone agrees that *ultra vires* is not a doctrine meant to protect officials from their risky or foolish conduct.

5. On the other hand, the Court gives no credence to several of Plaintiff's arguments: (1) that the daily call option scheme was authorized because it was widely known or (2) that not advancing the "public purpose" argument early on diminishes its legitimacy. In fact, the Court does not base its decision in this section upon the rationale that Springfield may have authorized the daily call option scheme in any manner. These legislative enactments merely confirm that the suggested public purpose was a legitimate one.

6. In addition, the Illinois Supreme Court has ruled that a contract for the purchase of power was within the authority of a municipality, regardless of whether the purchasing city was buying the power for its own use or for resale to another city. *See Illinois Power Co. v. City of Jacksonville,* 18 Ill.2d 618, 165 N.E.2d 300, 303 (1960). Although the *Jacksonville* decision predates the constitutional provision at issue, it strongly suggests that trading in electricity is a valid public purpose. Springfield argues that *Jacksonville* is distinguishable because that situation involved power that phys-

ically flowed through the "middleman" municipality. The Court, however, assigns no constitutional significance to whether the transaction is of the "touch" or "no-touch" variety, and, even if it did, nothing in the option agreement eliminated the possibility that Springfield would satisfy a daily call with "touch" electricity.

Springfield relies to a great extent upon the Illinois Supreme Court's decision in *City of Champaign v. Harmon,* 98 Ill. 491 (1881), which prohibited speculative purchases by a municipality. That case based its holding on an interpretation of a statute restricting municipal purchases of land. *See id.* at 494. Here, there is no doubt that Springfield has authorization to run the business of a municipal utility. Furthermore, whereas that decision concerned a purchase of real estate at a tax sale "for mere speculation or profit," *id.,* the option sale at issue in the instant case was intended to manage risks and reduce costs and prices. Over the past 120 years many other cases have fashioned a more modern *ultra vires* doctrine without so much as a nod to the *City of Champaign* case. The Court is convinced that modern Illinois courts would not find *City of Champaign* either binding or persuasive in these circumstances.

among these "approved" investments, so Springfield claims that its contract with LG & E violated the IPFIA and was *ultra vires*. Unfortunately, the IPFIA does not define the verb "invest," so the Court is again left to predict whether the Illinois courts would deem the daily call option agreement to be a species of investment restricted by the act.[7]

Illinois statutes or cases which define "investing" are a starting point for the analysis. Springfield cites two other Illinois statutes that include buying and selling options among "investments." *See* Technology Advancement and Development Act, 20 Ill.Comp.Stat.Ann. 700/1003(i) (West 1999); Illinois Community Development Finance Corporation Act, 315 Ill.Comp.Stat.Ann. 15/1.1 (West 1999). Both parties cite a recent Illinois case that defines an "investment contract" as one "whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party." *Daleiden v. Wiggins Oil Co.*, 118 Ill.2d 528, 115 Ill.Dec. 373, 517 N.E.2d 1059, 1063–64 (1987). Under this latter definition, the daily call option agreement does not qualify as an investment.

The Court finds the *Daleiden* definition most appropriate and analogous to this case. Among the IPFIA's approved "investments" are government and private bonds, treasury bills, interest-bearing savings accounts, interest-bearing certificates of deposit, and money market mutual funds. *See* 30 Ill.Comp.Stat.Ann. 235/2(a)(1)–(5) (West 1999). Each of these items is an arms-length investment tool. Springfield was running a business, not passively investing in one. As asserted by the ordinances and fact sheets, options were an integral part of how municipal utilities ran their businesses. Springfield never invested funds in the sense of abstractly entrusting money to a third party, and that it hoped to make a profit does not

alter the municipal business character of the options contract. Furthermore, the Court's decision that Springfield was conducting the regular business of an electric utility rather than "investing" in a disconnected commodity coheres strongly to the Court's holding that Springfield's option contract served a public purpose. Thus, in the Court's view, Springfield's *ultra vires* defense under the IPFIA must also fail.

## IV.

Under the Illinois Municipal Code, all contracts requiring an expenditure must be backed up by a municipal appropriation. *See* 65 Ill.Comp.Stat.Ann. 5/8–1–7(a) (West 1999). Springfield claims that no specific appropriation was made regarding the LG & E or Federal contracts, rendering the agreement *ultra vires*. But a separate appropriation is not necessary for each expenditure by a municipal agency such as Springfield's office of City Water, Light and Power. *See City of Chicago v. State & Mun. Teamsters*, 127 Ill.App.3d 328, 82 Ill.Dec. 488, 468 N.E.2d 1268, 1277 ("Clearly, section 8–1–7 does not require a separate appropriation for every expenditure by an administrative agency."). Springfield concedes this point, but argues that providing electric energy to satisfy LG & E's daily call is an "extraordinary expense," so the "municipal agency" exception does not apply. An appropriation is necessary if an expense is not a part of the agency's ordinary activities. *See Cannella v. Village of Bridgeview*, 284 Ill.App.3d 1065, 220 Ill.Dec. 482, 673 N.E.2d 394, 399–400 (1996).

The characterization of the daily call option contract as an "extraordinary expense" involves the same question as that concerning the Court's "public purpose" holding—whether selling options is a normal part of the municipality's energy utility business. Therefore, consistent with that holding, the Court finds that options

---

7. LG & E does not claim that Springfield's contract is not an investment because Springfield *sold* the option, rather than *bought* it.

The Court agrees with Springfield that the definition of "invest" should not turn on whether the option was bought or sold.

agreements are not an extraordinary expense for Springfield, so the contract needs no appropriation.

## V.

Defendant makes any number of arguments and dire predictions which this Court finds unnecessary to discuss or resolve. The Court does not believe that this decision would make meaningless the prohibitions of the Illinois Constitution or any of the other statutes involved. In fact, this opinion endorses the control core of those decisions by which Illinois courts define the modern scope of *ultra vires*. Nor does the Court implicitly sanction other speculative ventures intended solely to make a profit for a municipality. In the final analysis, the Court need not define the extreme limits of *ultra vires*, only whether these acts are fairly within those limits readily ascertainable.

The Court will enter an order consistent with this Memorandum Opinion.

## ORDER

The parties have filed· competing motions for a summary judgment contesting whether the daily call option agreement was *ultra vires* the City of Springfield pursuant to the Illinois Constitution, the Illinois Public Funds Investment Act, and the Illinois Municipal Code. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiff's motion is SUSTAINED and Defendant's motion is DENIED. Therefore, the City of Springfield may not assert an *ultra vires* defense under the Illinois Constitution, the Illinois Public Investment Act and the Illinois Municipal Code.