(No. 81605.—

*In re* MARRIAGE OF LARRY LAPPE and LYNN LAPPE, Appellee (The Illinois Department of Public Aid, Appellant).

*Opinion filed May 1, 1997.*

FREEMAN, J., joined by McMORROW, J., dissenting.

James E. Ryan, Attorney General, of Springfield

(Barbara A. Preiner, Solicitor General, and Janon E. Fabiano, Assistant Attorney General, of Chicago, of counsel), for appellant.

Robert F. Kaucher, of Highland, for appellee.

JUSTICE BILANDIC delivered the opinion of the court:

The appellant, the Illinois Department of Public Aid (the Department), filed a motion to intervene in a dissolution action pending between Larry and Lynn Lappe in the circuit court of Madison County. The Department sought to intervene on behalf of Larry Lappe, the custodial parent of the divorced couple's unemancipated minor child, pursuant to sections 10—1 and 10—10 of the Public Aid Code (305 ILCS 5/10—1, 10—10 (West 1994)). The Department also filed a petition on Larry's behalf to establish a child support obligation on the part of the appellee, Lynn Lappe. Lynn filed objections to the Department's motion to intervene, arguing that sections 10—1 and 10—10 of the Public Aid Code were unconstitutional in that they violated the Illinois Constitution's mandate that public funds be used only for public purposes. Ill. Const. 1970, art. VIII, § 1. The circuit court ultimately denied the Department's motion to intervene, finding that the application of these sections to allow intervention by the Department in this case would constitute an unconstitutional use of public funds for a purely private purpose. The Department appealed to the appellate court and the appellate court transferred the appeal to this court pursuant to Supreme Court Rule 302(a)(1) (134 Ill. 2d R. 302(a)(1)).

## FACTS

Larry and Lynn Lappe were married on October 18, 1969. The couple had two children, Chad and Nicholas. In 1989, both Lynn and Larry filed petitions for dissolu-

tion of the marriage in the circuit court of Madison County. On August 21, 1989, the circuit court entered an order dissolving the marriage. The record reveals that Larry filed for bankruptcy pursuant to chapter 7 of the United States Bankruptcy Code on February 12, 1990. According to Larry's bankruptcy schedules, he was then employed as the United States Postmaster of Sorento, Illinois, and had gross earnings of $33,600 in 1989.

On July 13, 1990, the circuit court entered a judgment of dissolution of marriage which incorporated a marital settlement agreement, a joint parenting order, and a qualified domestic relations order regarding the division of Larry's interest in the Civil Service Retirement System Pension Plan. The marital settlement agreement stated that Larry would pay $523.22 per month in child support, which amount would be adjusted if necessary. The joint parenting order stated that the parties would have joint custody of the two children, with Lynn having primary residential custody.

On February 8, 1991, the circuit court entered an order, pursuant to an agreement of the parties, increasing Larry's child support payments to $546.93 per month. Larry's child support payments were again increased by agreement on February 5, 1992, to $567.89 per month, based on a salary increase. On July 30, 1992, a stipulated order was entered modifying Larry's child support obligation to $504.83 per month, because of the emancipation of the couple's older child, Chad.

On March 16, 1993, the circuit court entered an order modifying the judgment of dissolution of marriage, pursuant to the parties' stipulation. This stipulated order provided that the principal place of residence for the couple's minor child, Nicholas, was changed from Lynn to Larry, commencing on March 1, 1993. The order provided that Larry's obligation to pay child sup-

port to Lynn would cease, and that Lynn would not be obligated to pay child support to Larry.

On July 26, 1995, the Illinois Department of Public Aid, by the Madison County State's Attorney, filed a motion to intervene on behalf of Larry in the Lappe dissolution action. As grounds for intervention, the Department stated that the Department "is authorized to institute legal action on behalf of [Larry] for judicial enforcement of [Lynn's] support liability, pursuant to 305 ILCS 5/10—10 and 5/10—3.1." On that same date, the Department filed a petition to establish an obligation on the part of Lynn to pay child support for Nicholas. On August 1, 1995, the circuit court granted the Department's motion to intervene.

On August 9, 1995, Lynn filed an objection to the Department's motion to intervene. Lynn argued that the Department's motion should be denied because she "believed" that Larry was not a recipient of public aid and that he had a "large and sufficient income (approximately $41,000.00 per year)." On August 29, 1995, Lynn filed an amended objection to the Department's motion to intervene. The amended objection argued that sections 10—1 and 10—10 of the Public Aid Code, from which the Department derived its authority to intervene in this case, were unconstitutional. Lynn contended that these provisions violated the separation of powers doctrine contained in section 1 of article II of the Illinois Constitution of 1970, and the mandate that public funds may be used only for public purposes contained in section 1 of article VIII of the Illinois Constitution of 1970.

On April 3, 1996, the circuit court entered an order setting aside its previous order granting the Department leave to intervene and denied the Department leave to intervene. The circuit court determined that the relevant statutory provisions authorized the Department to intervene on behalf of Larry. The court found,

however, that the provisions violated the constitutional mandate that public funds be used only for public purposes. The court determined that there was no proper public purpose in the Department's providing child support enforcement services to Larry because Larry made $40,000 per year and was therefore able to pursue child support from Lynn without the Department's assistance. The circuit court rejected the contention that these provisions violated the separation of powers doctrine. The circuit court's order concluded as follows:

"It is therefore ordered, that the statutory provisions relied upon and cited herein, while not unconstitutional in the absolute sense, would lead to an unconstitutional result in the instant case, and accordingly the Order of August 1, 1995 granting the State's Attorney leave to intervene is set aside, and said Motion for Leave to Intervene is denied."

The circuit court subsequently entered an order finding that there was no just reason for delaying the appeal of its April 3, 1996, order.

The Department filed a notice of appeal to the appellate court. The Department thereafter filed a motion in the appellate court to transfer the appeal to this court pursuant to Supreme Court Rule 302(a)(1), because the circuit court had held a statutory provision unconstitutional. Lynn objected to the motion to transfer. On August 9, 1996, the appellate court entered an order transferring the appeal to this court.

## ANALYSIS

### Jurisdiction

Lynn challenges this court's jurisdiction over this appeal. The Department argues that jurisdiction is proper in this court pursuant to Supreme Court Rule 302(a)(1), because the circuit court held that a state statute was unconstitutional. Supreme Court Rule 302(a)(1)

provides for appeals to be taken directly to this court from final judgments of circuit courts "in cases in which a statute of the United States or of this State has been held invalid." 134 Ill. 2d R. 302(a). Lynn contends that the circuit court's order in this case did not hold a statute unconstitutional but, rather, held only that the statute was unconstitutional *as applied* in this case. Lynn relies on this court's decision in *Rehg v. Illinois Department of Revenue*, 152 Ill. 2d 504, 509 (1992), in which we noted that a lower court order that "simply declares that application of [a] statute would violate a particular defendant's constitutional rights" is not directly appealable to this court pursuant to Rule 302(a).

A narrow reading of the circuit court's order in this case supports Lynn's argument. The order states that the statutory provisions "would lead to an unconstitutional result in the instant case." We must look, however, to the effect of the circuit court's order to determine whether the order actually declared the statutory provisions unconstitutional on their face. See *Doe v. Gainer*, 162 Ill. 2d 15, 18 (1994). If the effect of the circuit court's order was to declare a statute unconstitutional on its face, this court has jurisdiction under Rule 302(a)(1). See *Doe*, 162 Ill. 2d at 18 (although circuit court's order stated that statute was unconstitutional "as applied" to the plaintiff, effect of order was to declare provision unconstitutional on its face and jurisdiction under Rule 302(a)(1) was proper); *First of America Bank, Rockford, N.A. v. Netsch*, 166 Ill. 2d 165, 169 (1995) (this court assumed jurisdiction under Rule 302(a)(1) of appeal from circuit court order which held that certain statutory provisions were unconstitutional "as applied" to the plaintiff); *People v. Roos*, 118 Ill. 2d 203 (1987) (this court assumed jurisdiction under Rule 302(a)(1) of appeal from circuit court order which held that a statute was unconstitutional "as applied" to the

practice of acupuncture); *Miller v. Lockett*, 98 Ill. 2d 478, 479-80 (1983) (this court held that jurisdiction was proper under Rule 302(a)(1) even though the circuit court did not directly state that the statute was unconstitutional because it appeared from the order that the circuit court found the statute invalid); *Sommer v. Village of Glenview*, 79 Ill. 2d 383, 385-86 (1980) (this court held that it had jurisdiction under Rule 302(a)(1) of appeal from circuit court order which stated only that a particular statutory provision could not be applied to home rule units because, in effect, the circuit court order necessarily held that the statutory provision was unconstitutional as applied to home rule units).

The Department asserts that the effect of the circuit court's order was to declare sections 10—1 and 10—10 of the Public Aid Code, in part, unconstitutional on their face. We agree. The circuit court ruled that sections 10—1 and 10—10 of the Public Aid Code were unconstitutional as applied to Larry because, in the court's opinion, Larry earned $40,000 per year and therefore was capable of pursuing child support enforcement services without the Department's assistance.[1] As we discuss in detail later in this opinion, however, sections 10—1 and 10—10 clearly grant the Department the discretion to provide child support enforcement services to *any* individual who applies for them, regardless of that individual's financial capability to pursue enforcement privately. Thus, Larry is within the class of

---

[1]We note in passing that the record contains no evidence regarding either Larry's or Lynn's current financial status. Although the circuit court concluded that Larry earned $40,000 per year, the only basis in the record for that conclusion is an allegation in Lynn's unverified objection to the petition to intervene where she states that she "verily believes that Larry K. Lappe is not a recipient of public aid, and further verily believes that he has a large and sufficient income (approximately $41,000 per year)."

recipients contemplated by the statutory provisions. The trial court's ruling that the provisions are unconstitutional as applied to Larry is therefore, in effect, a ruling that the provisions are unconstitutional to the extent they allow application to Larry and others who are "financially capable." In effect, the circuit court declared portions of sections 10—1 and 10—10 unconstitutional on their face. We therefore have jurisdiction pursuant to Rule 302(a)(1).

### Constitutionality

We now turn to the substantive issue in this case: whether sections 10—1 and 10—10 of the Public Aid Code, in allowing the Department the discretion to provide child support enforcement services to an individual who may be financially capable of pursuing enforcement privately, serve a public purpose within the meaning of article VIII, section 1, of the Illinois Constitution. The argument that these provisions violate the separation of powers doctrine has not been raised in this court.

It is well established that legislative enactments enjoy a heavy presumption of constitutionality. *People ex rel. Sheppard v. Money*, 124 Ill. 2d 265, 272 (1988); *County of Kane v. Carlson*, 116 Ill. 2d 186, 216 (1987). The party challenging the constitutionality of a statute has the burden of clearly establishing its invalidity. *People v. Adams*, 149 Ill. 2d 331, 338 (1992); *Bernier v. Burris*, 113 Ill. 2d 219, 227 (1986). Courts have a duty to sustain legislation whenever possible and resolve all doubts in favor of constitutional validity. *Adams*, 149 Ill. 2d at 338; *Sheppard*, 124 Ill. 2d at 272.

The statutory provisions at issue in this case govern the Department's provision of child support enforcement services to individuals who are not receiving public aid. These provisions are part of a larger statutory scheme for the enforcement of child support obligations,

and a review of that statutory framework is necessary to provide a proper context for these provisions. We begin with the pertinent provisions of the federal Social Security Act. 42 U.S.C. § 301 *et seq.* (1994).

### Social Security Act

The federal welfare program known as Aid to Families with Dependent Children (AFDC), contained in Title IV-A of the Social Security Act, established a scheme under which the federal government would reimburse states for a percentage of the funds that states distributed to needy families with children. 42 U.S.C. § 601 *et seq.* (1994). States were not required to participate in the AFDC program, but if a state chose to participate in the program, it had to comply with the requirements of the Social Security Act and the regulations promulgated thereunder. 42 U.S.C. § 602 (1994); *King v. Bradley*, 829 F. Supp. 989, 991 (N.D. Ill. 1993). Title IV-A set out, in considerable detail, the elements which must be included in a state AFDC plan. 42 U.S.C. § 602 (1994). If a state AFDC plan met with federal approval, the state was entitled to reimbursement from the federal government of a substantial percentage of the state funds it expended in AFDC payments. 42 U.S.C. § 603(a) (1994).

In 1974, Congress amended the Social Security Act by adding Title IV-D. 42 U.S.C. § 651 *et seq.* (Supp. 1975). Title IV-D established a Child Support Enforcement Program, "[f]or the purpose of enforcing the support obligations owed by absent parents to their children." 42 U.S.C. § 651 (1994). At the same time, Title IV-A was amended to require states, as a condition of receiving federal AFDC funds, to adopt child support enforcement programs that complied with Title IV-D. 42 U.S.C. § 602(a)(27) (1994). Accordingly, in order for a state to obtain federal funding for its AFDC program, the state was required to operate a child support enforcement program in compliance with Title IV-D. 42 U.S.C.

§§ 602(a)(27), 603(h) (1994); see also *People v. Sheppard*, 124 Ill. 2d 265, 270 (1988); *King v. Bradley*, 829 F. Supp. 989, 991 (N.D. Ill. 1993); *Carelli v. Howser*, 923 F.2d 1208, 1210 (6th Cir. 1991).

A state program under Title IV-D must provide a variety of services including establishment of paternity, establishment and enforcement of support obligations, and parent locator services. 42 U.S.C. § 652(a)(1) (1994); 45 C.F.R. §§ 303.3, 303.4, 303.5, 303.6 (1994). By operating a program of child support enforcement services in compliance with Title IV-D, a state not only would receive federal AFDC funding, but it would also be reimbursed by the federal government for a large percentage, ranging from 66% to 90%, of the state funds it expends in connection with the Title IV-D program. 42 U.S.C. § 655 (1994). In addition, Title IV-D provides for states to be paid incentive payments to "encourage and reward" states which operate efficient enforcement programs. 42 U.S.C. § 658(b) (1994). The incentive payments will generally equal 6% of the state's support collections in AFDC cases and 6% of the state's support collections in non-AFDC cases in a particular year. 42 U.S.C. § 658(b) (1994).

Title IV-D provides detailed requirements with which a state plan must comply in order for the state to be entitled to federal funding. 42 U.S.C. § 654 (1994). One of the requirements of Title IV-D is that the state must make the same child support enforcement services available to both families receiving AFDC and families who are not receiving AFDC. 42 U.S.C. § 654(6) (1994). The version of section 654(6) applicable to this case provides, in pertinent part:

"A State plan for child and spousal support must—

\* \* \*

(6) provide that (A) the child support collection or paternity determination services established under the

plan shall be made available to any individual not otherwise eligible for such services upon application filed by such individual with the State, *** (B) an application fee for furnishing such services shall be imposed, which shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds, *** the amount of which (i) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year ***." 42 U.S.C. § 654(6) (1994).

The Office of Child Support Enforcement (OCSE), the federal agency charged with administering the AFDC program, has promulgated regulations to carry out the Title IV-D program. 45 C.F.R. § 301 *et seq.* (1994). In accordance with Title IV-D, the OCSE regulations provide that states must make child support enforcement services available to non-AFDC recipients. Regulation 302.33 provides, in relevant part:

"Services to individuals not receiving AFDC or title IV-E foster care assistance.

(a) Availability of Services. (1) The State plan must provide that the services established under the plan shall be made available to any individual who:

(i) Files an application for the services with the IV-D agency." 45 C.F.R. § 302.33 (a)(1)(i) (1994).

We note, for clarification purposes, that in late 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104—193, 110 Stat. 2105 (Personal Responsibility Act). The Personal Responsibility Act replaced the federal AFDC program contained in Title IV-A with a program of block grants to states for Temporary Assistance for Needy Families (TANF). Pub. L. 104—193, 110 Stat. 2112-13. TANF, like AFDC, provides the states participating in the program with federal funding for the states' programs of public assistance to families with dependent children. Pub. L. 104—193, 110 Stat. 2134. In order to be eligible for a block grant under the TANF program,

a state must still operate a child support enforcement program in compliance with Title IV-D. Pub. L. 104—193, 110 Stat. 2114, 2198-2200. The Personal Responsibility Act also amended some portions of Title IV-D. However, Title IV-D still requires that a state program must provide child support enforcement services to "any *** child, if an individual applies for such services with respect to the child." Pub. L. 104—193, 110 Stat. 2199.

Illinois Public Aid Code

Illinois chose to participate in the federal AFDC program and thereby receive federal funding for its public aid program. 305 ILCS 5/12—4.5 (West 1994); 89 Ill. Adm. Code § 160.10(a) (1994); see also *King v. Bradley*, 829 F. Supp. 989, 991 (N.D. Ill. 1993).[2] As a result, Illinois is required to operate a child support enforcement program that complies with Title IV-D. 42 U.S.C. § 602(a)(27) (1994). Illinois' Title IV-D program is contained in article X of the Public Aid Code and part 160 of the Department's regulations. 305 ILCS 5/10—1 *et seq.* (West 1994); 89 Ill. Adm. Code § 160.1 *et seq.* (1994).

Article X of the Public Aid Code states that its purpose is to provide for locating an absent parent, for determining his or her financial circumstances, and for enforcing his or her legal obligation of support. 305 ILCS 5/10—1 (West 1994). The services available under article X include (1) identifying and locating an absent parent, (2) establishing parentage, (3) establishing support obligations, (4) enforcing and collecting support, (5) receiving and distributing support payments, and (6) maintaining accurate records of location and support

---

[2]For ease of reference, we will refer to the federal funding Illinois receives toward its public assistance program as "AFDC" funding even though, pursuant to the 1996 Personal Responsibility Act, such federal funding will in the future be provided through the TANF block grant program.

activities. 89 Ill. Adm. Code § 160.10(c) (1994). The Department may provide these services though the use of either the administrative process or the court system. 305 ILCS 5/10—10, 10—11 (West 1994); 89 Ill. Adm. Code § 160.10(d) (1994). To establish a support obligation where a court has previously acquired jurisdiction in a case, the Department refers the case to the Attorney General or State's Attorney for judicial action, which includes the preparation of petitions to intervene, petitions to establish support obligations, and petitions to modify. 305 ILCS 5/10—10, 10—3.1 (West 1994); 89 Ill. Adm. Code §§ 160.60(e)(1), (e)(2) (1994).

The provisions at issue in this case are contained in article X and pertain to the provision of child support enforcement services to non-AFDC recipients. In accordance with the federal mandate of Title IV-D, article X provides that the child support enforcement services provided thereunder shall be available to both AFDC families and non-AFDC families. Section 10—1 provides, in pertinent part:

> "At the discretion of the Illinois Department of Public Aid, the child and spouse support services established under this Article may also be furnished in behalf of spouses and dependent children who are not applicants for or recipients of financial aid under this Code. The Department may limit eligibility of these persons to designated income classes. If non-applicants and non-recipients are included, the Department may establish a schedule of reasonable fees, to be paid for the services provided and may deduct a collection fee, not to exceed 10% of the amount collected, from such collection. The Illinois Department of Public Aid shall cause to be published and distributed publications reasonably calculated to inform the public that individuals who are not recipients of or applicants for public aid under this Code are eligible for the child and spouse support services under this Article X." 305 ILCS 5/10—1 (West 1994).

Section 10—10 specifically refers to the use of the court

system to provide child support enforcement services. In relevant part, section 10—10 provides:

"Actions may also be brought under this Section in behalf of any person who is in need of support from responsible relatives, *** who is not an applicant for or recipient of financial aid under this Code." 305 ILCS 5/10—10 (West 1994).

In the present case, the circuit court determined that sections 10—1 and 10—10 authorized the Department to intervene and file a petition to establish child support on behalf of Larry. The court ruled, however, that, in so doing, the statutory provisions violated the Illinois Constitution's mandate that public funds be used only for public purposes. The circuit court found that there was no public purpose in the "use of State funds to provide a lawyer for a parent making $40,000 a year."

We first note that the circuit court was correct in concluding that the pertinent provisions of sections 10—1 and 10—10 authorize the Department to intervene on behalf of Larry in this case. These provisions grant the Department the discretion to provide child support enforcement services to any individual who applies for such services, without regard to his or her financial status. Section 10—1 states that the Department "may" limit eligibility to designated income groups. 305 ILCS 5/10—1 (West 1994). Implicit in that statement is that the Department may choose *not* to limit eligibility based on income. The Department regulations state that, in accordance with Title IV-D, child support enforcement services are available to "persons not receiving [public aid], upon application to the Department for such services." 89 Ill. Adm. Code § 160.10(a)(9) (1996). The Department regulations do not contain any provision limiting eligibility based on income, and the parties do not direct our attention to any other source for such limitation. The legislative history of section 10—10 further supports the conclusion that the Department is

granted the discretion to provide child support enforcement services to any individual, regardless of financial need. Prior to 1975, section 10—10 stated that actions for child support enforcement could be brought by the Department "in behalf of any person *in necessitous circumstances* who is in need of support from responsible relatives." (Emphasis added.) Ill. Rev. Stat. 1973, ch. 23, § 10—10. When section 10—10 was amended in 1975, the phrase "in necessitous circumstances" was deleted from that sentence, so that the section would read, as it presently does, that actions could be brought in behalf of "any person who is in need of support from responsible relatives." The legislature deliberately omitted financial need of the applicant as a restriction on the Department's authority. Thus, the pertinent provisions of sections 10—1 and 10—10 clearly authorize the Department to intervene and petition to establish child support on behalf of Larry.

We must therefore determine whether the provision of child support enforcement services to a non-aid recipient who may be financially capable of pursuing such enforcement privately is a public purpose within the meaning of article VIII, section 1, of our state constitution. We agree with the Department that Lynn failed to meet her burden of establishing that no public purpose is served by the Department's provision of child support enforcement services in this case.

## Public Purpose

Article VIII, section 1, of the Illinois Constitution of 1970 provides that "[p]ublic funds, property or credit shall be used only for public purposes." Ill. Const. 1970, art. VIII, § 1. This court has long recognized that what is for the public good and what are public purposes are questions which the legislature must in the first instance decide. *People ex rel. City of Salem v. McMackin*, 53 Ill. 2d 347, 355 (1972); *Cremer v. Peoria Housing Authority*,

399 Ill. 579, 588 (1948). In making this determination, the legislature is vested with a broad discretion, and the judgment of the legislature is to be accepted in the absence of a clear showing that the purported public purpose is but an evasion and that the purpose is, in fact, private. *Salem*, 53 Ill. 2d at 355; *People ex rel. Mc-David v. Barrett*, 370 Ill. 478, 482 (1939); *Hagler v. Small*, 307 Ill. 460, 474 (1923). In the words of Justice Holmes, "a declaration by a legislature concerning public conditions that by necessity and duty it must know, is entitled at least to great respect." *Block v. Hirsh*, 256 U.S. 135, 154, 65 L. Ed. 865, 870, 41 S. Ct. 458, 459 (1921).

This court has previously set forth guidelines for this inquiry:

> "In deciding whether such purpose is public or private, courts must be largely influenced by the course and usage of the government, the object for which taxes and appropriations have been customarily and by long course of legislation levied and made, and what objects have been considered necessary to the support and for the proper use of the government. Whatever lawfully pertains to this purpose and is sanctioned by time and the acquiescence of the people may well be said to be a public purpose and proper for the maintenance of good government." *Hagler*, 307 Ill. at 474.

What is a "public purpose" is not a static concept, but is flexible and capable of expansion to meet the changing conditions of a complex society. *People ex rel. Adamowski v. Chicago R.R. Terminal Authority*, 14 Ill. 2d 230, 236 (1958); *People v. Chicago Transit Authority*, 392 Ill. 77, 86 (1945). Moreover, " '[t]he power of the State to expend public moneys for public purposes is not to be limited, alone, to the narrow lines of necessity, but the principles of wise statesmanship demand that those things which subserve the general wellbeing of society and the happiness and prosperity of the people shall meet the consideration of the legislative body of the State, though they ofttimes call for the expenditure of

public money.' " *Salem*, 53 Ill. 2d at 357-58, quoting *Hagler*, 307 Ill. at 475. The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classified as involving a public purpose. *Salem*, 53 Ill. 2d at 356; see also *Marshall Field & Co. v. Village of South Barrington*, 92 Ill. App. 3d 360, 366 (1981).

The Department argues that the pertinent portions of sections 10—1 and 10—10 serve a public purpose by advancing the welfare of children. We agree. The provision of child support enforcement services on behalf of all dependent children serves a public purpose by promoting the right of children to be supported by their parents, fostering parental responsibility and involvement, and preventing families from becoming dependent on welfare.

This court has recognized that Illinois has a strong interest in preserving and promoting the welfare of children. *People ex rel. Sheppard v. Money*, 124 Ill. 2d 265, 277 (1988). In this regard, this court has noted that "[a] parent's duty to support his or her minor child is among the oldest principles of law." *Sheppard*, 124 Ill. 2d at 269-70, citing 1 W. Blackstone, Commentaries *446-47. "Indeed, it is difficult to imagine a more compelling State interest than the support of children." *Sheppard*, 124 Ill. 2d at 277. As described above, the Illinois child support enforcement program provides assistance to custodial parents in locating absent parents, establishing parentage, and establishing, enforcing and collecting support obligations. The provision of these services clearly serves the public purpose of advancing the welfare of children by enforcing a child's right to be supported by his parents, fostering parental responsibility and parental involvement with the child, and preventing the child and custodial parent from having to turn to welfare.

This public purpose is served by the extension of these services to all children, regardless of the financial circumstances of their custodial parents. *All* children have the right to be supported by their parents, and are benefitted, both financially and otherwise, when an absent parent provides support. The legislature could rightly determine that a public purpose is served by providing an effective program of child support enforcement that is available on behalf of all children with an absent parent. The focus of this legislation is on *effective* enforcement. The provisions simply create a mechanism whereby custodial parents of dependent children can, with minimal time and expense, obtain assistance with the paperwork involved in child support enforcement, with locating the person obligated to pay support and with taking the necessary steps, including judicial action, to ensure that the proper amount of money is collected. As one article describes it, "with the help of IDPA potentially available in virtually all cases, custodial parents can tap various resources that allow for effective enforcement." D. Bergbreiter & A. McKay, *Child Support Enforcement and the Illinois Department of Public Aid*, 81 Ill. B.J. 638, 643 (1993).

Our precedent supports the conclusion that a public purpose is served by the legislation challenged in this case. In *Board of Education, School District No. 142 v. Bakalis*, 54 Ill. 2d 448 (1973), this court found that a public purpose was served by a provision of the School Code which required school boards to provide free transportation to school to nonpublic school students. The plaintiff challenged the statute, arguing that it violated article VIII, section 1, of the Illinois Constitution of 1970 because it constituted the use of public funds for a nonpublic purpose. This court rejected that argument, finding that the transportation of school children, public or nonpublic, is a public purpose. *Bakalis*,

54 Ill. 2d at 466. The enforcement of a child's legal right to support from its parent must be considered at least as beneficial to the public good as the transportation of children to school.

In addition, it is important to note that these provisions were included in our Public Aid Code in order to comply with Title IV-D of the Social Security Act. It is appropriate to look at the purposes sought to be achieved by Congress in requiring that states include these provisions. One purpose of Title IV-D was to decrease welfare costs by collecting child support owed by noncustodial parents whose dependent children were receiving public aid. See S. Rep. No. 93—1356, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 8133, 8145-47. Title IV-D, however, expressly requires that child support enforcement services be provided to non-AFDC families who make application for such services. The legislative history of Title IV-D reveals dual purposes behind the extension of child support enforcement services to non-AFDC families. One purpose was to reduce welfare costs by preventing families from becoming dependent on public aid as a result of unpaid child support. S. Rep. No. 93—1356, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 8133, 8145-47. The legislative history, however, reveals that Title IV-D was also aimed at the broader goal of assuring that *all* children will obtain assistance in securing child support regardless of their circumstances.

In recommending passage of Title IV-D in 1974, the Senate finance committee noted that "the enforcement of child support obligations is not an area of jurisprudence about which this country can be proud," and that Title IV-D was designed to help "all children" receive the support from absent parents that was their right. S. Rep. No. 93—1356, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 8133, 8145-46. Further, in 1984,

Congress amended Title IV-D to strengthen the effectiveness of the program and to clarify that its purpose was to provide assistance in securing child support to all children "regardless of their circumstances." S. Rep. No. 98—387, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.C.C.A.N. 2397, 2397. To that end, the 1984 amendments added language to the purpose clause of Title IV-D so that it would specifically state that its purpose was to assure assistance in obtaining support "to all children \*\*\* for whom such assistance is requested." 42 U.S.C. § 651 (1994). This purpose was also emphasized in the recent amendments to Title IV-D made by the Personal Responsibility Act of 1996. In explaining the amendments to Title IV-D, the House report stated that:

> "because millions of families are at risk of needing public welfare unless noncustodial parents provide child support, and because *additional millions of families are not receiving the financial support that is their legal right from noncustodial parents*, States must provide child support services to nonwelfare families that request such services." (Emphasis added.) H.R. Rep. No. 104—651, 104th Cong., 2d Sess., *reprinted in* 1996 U.S.C.C.A.N. 2380, 2456.

In addition, we note that other states have enacted statutes which provide, in accordance with Title IV-D, that the same child support enforcement services must be provided to both AFDC families and non-AFDC families. See *Cabinet for Human Resources v. Houck*, 908 S.W.2d 673 (Ky. 1995); *Thaysen v. Thaysen*, 583 So. 2d 663 (Fla. 1991); *Worth v. Superior Court*, 207 Cal. App. 3d 1150, 255 Cal. Rptr. 304 (1989); *Jeske v. Jeske*, 144 Wis. 2d 364, 424 N.W.2d 196 (1988); *Krogstad v. Krogstad*, 388 N.W.2d 376 (Minn. 1986); *Carter v. Morrow*, 562 F. Supp. 311 (W.D.N.C. 1983). Several courts in other states have addressed the issue of whether it is a violation of Title IV-D for a state to limit eligibility for child support enforcement services to non-AFDC recipients who are financially incapable of pursuing enforcement

privately. Those courts have held that Title IV-D requires that states provide child support enforcement services to *all* custodial parents who apply for such services, regardless of the parent's financial circumstances. See *State v. Wagner*, 136 Wis. 2d 1, 400 N.W.2d 519 (1986); *Thurman v. Commonwealth of Kentucky, Cabinet for Human Resources*, 828 S.W.2d 368 (Ky. 1992); *South Carolina Department of Social Services v. Deglman*, 290 S.C. 542, 351 S.E.2d 864 (1986).

Further, the legislation challenged here has been in existence in this state for over 20 years. In determining whether a statute serves a public purpose, a court "may take into consideration a long course of legislation and usage of the government." *Barrett*, 370 Ill. at 485; *Hagler*, 307 Ill. at 474. The pertinent portions of sections 10—1 and 10—10 have been in effect, in substantially their present form, since 1975. Thus, for over 20 years, the Department has possessed the authority to provide child support enforcement services to non-AFDC families, regardless of their financial circumstances. A Department report indicates that since the Department began enforcing child support orders in 1976, the Department has collected more than $1.4 billion for the children of Illinois. Illinois Department of Public Aid Biennial Report, Fiscal Years 1993-94, at 10. Department reports also indicate that in fiscal year 1995, the Department's child support enforcement program had an active client caseload of 495,833 clients, of which 243,551 were non-AFDC clients, and the Department collected a total of $241 million in support, with $164.6 million coming from non-AFDC case collections. Illinois Department of Public Aid Human Services Plan, Fiscal Years 1994, 1995, 1996, at 109. For fiscal year 1996, it was estimated that total support collections would equal $270.5 million, with $185.5 million coming from non-AFDC cases. Illinois Department of Public Aid Human Services Plan, Fiscal Years 1994, 1995, 1996, at 109.

In view of the foregoing, it is clear that our legislature, the legislatures of other states, and Congress have all determined that the provision of effective child support enforcement services on behalf of all children, regardless of the financial circumstances of their parents, is an important governmental goal. It is uniquely within the province of these legislative bodies to make these determinations of governmental policy. *Hagler*, 307 Ill. at 474. Our only permissible inquiry is whether the legislature's determination is constitutionally permissible. We find no constitutional basis for overturning the judgment of our legislature on this issue.

Lynn contends, however, that the legislation challenged here does not serve any public purpose, but serves only to provide a private benefit to Larry in the form of free legal services. This is not an accurate characterization. The Department's child support enforcement services are being provided for the benefit of the Lappes' dependent child, not the custodial parent. Child support payments are intended to go directly for the benefit of the child. *In re Marriage of Pihaly*, 258 Ill. App. 3d 851, 856 (1994). Moreover, article X specifically negates the contention that the purpose of these provisions is to provide free legal representation to custodial parents. Section 10—3.1 provides that "[a]n attorney who provides representation pursuant to this Section shall represent the Illinois Department exclusively *** [and] an attorney-client relationship does not exist *** between that attorney and *** an applicant for or recipient of child and spouse support services ***." 305 ILCS 5/10—3.1 (West 1994). The fact that Larry may be incidentally benefitted by the provision of these services does not destroy the public nature of the legislation. This court has recognized that "[t]he execution of a public purpose which involves the expenditure of money is

usually attended with private benefits." *Hagler*, 307 Ill. at 473. If the principal purpose of the enactment is public in nature, it is irrelevant that there will be an incidental benefit to private interests. *Salem*, 53 Ill. 2d at 355; *Adamowski*, 14 Ill. 2d at 236.

Lynn also takes the position that non-AFDC individuals should be charged a fee for the enforcement services provided under this legislation and that, absent such a fee, the provisions are unconstitutional. We note first that the Department regulations require that non-AFDC applicants for services pay an application processing fee not to exceed $25. 89 Ill. Adm. Code § 160.15 (1994). Although the record is silent on this issue, we assume that this fee was charged to Larry, as he was required, under the regulations, to file an application with the Department to obtain these services. 89 Ill. Adm. Code § 160.10(a)(9) (1996). Apparently then, Lynn's contention is that fees in addition to the application fee are required to be charged to Larry if the statutory provisions are to be constitutional.

Section 10—10.1 of our Code directs that, where services are provided on behalf of a non-aid recipient, under certain circumstances a collection fee shall be collected *from the person who owes the support obligation.* 305 ILCS 5/10—10.1 (West 1994). Further, section 10—1 of the Code grants the Department discretion to establish a reasonable schedule of fees and to deduct a collection fee, not to exceed 10% of the amount collected, from the support collected. 305 ILCS 5/10—1 (West 1994). Other than the application processing fee, the Department regulations do not set forth a plan for additional fees or other cost recovery from the applicant for services. The parties do not direct our attention to any other source for such additional fees to be recovered from the applicant. Thus, our statutory scheme does not provide for the imposition of a fee, beyond the application process-

ing fee, to be imposed upon non-AFDC applicants for support enforcement services. Nevertheless, we fail to see how the Department's decision whether to impose a fee for the services provided impacts on whether the legislation serves a public purpose.

Lynn also urges this court to affirm the circuit court because the parties had, two years earlier, stipulated that Lynn would not pay child support, the court entered an order pursuant to that stipulation, and there is no claim that there has been any change in circumstances warranting that Lynn now be ordered to pay child support. All of these circumstances, however, pertain to the merits of the petition to establish a child support obligation on the part of Lynn. Due to the circuit court's denial of the motion to intervene, the merits of that petition were never reached. The only issue before this court is whether the circuit court erred in denying the Department leave to intervene, and none of these circumstances are relevant to that issue.

In conclusion, we find no reason to overturn the legislature's determination that a public purpose is served by the provision of child support enforcement services on behalf of all children, regardless of the financial circumstances of their custodial parent. Child support enforcement in this country has, in the past, been a national disgrace, due both to the lack of effective enforcement programs and the failure to implement those programs by the officials charged with enforcement. See S. Rep. No. 93—1356, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 8133, 8145-49; *People v. Sheppard*, 124 Ill. 2d 265, 270 (1988). It was the legislature's province to assess this crisis and determine whether, and how, to respond. We are not persuaded that the legislature exceeded the bounds of its discretion in enacting the legislation here challenged.

## CONCLUSION

For the foregoing reasons, we reverse the circuit

court's order which held sections 10—1 and 10—10 of the Public Aid Code unconstitutional and denied the Department's motion to intervene. This cause is remanded to the circuit court for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

JUSTICE FREEMAN, dissenting:

Jurisdiction is the cornerstone of the entire judicial process; without it, courts have no power to decide the merits of a controversy. The absence of jurisdiction is so serious that it is one of the few defects which cannot be waived even by consent of all the parties. As a result, courts themselves, at every level, have an obligation to raise the lack of jurisdiction *sua sponte* and to dismiss a pending action whenever it becomes apparent that jurisdiction does not exist. Accordingly, jurisdiction is not a fiction which can be created out of whole cloth. It cannot be manufactured, nor can its limitations be circumvented merely to suit the exigencies of the moment. Yet that is precisely what the majority does today. Because I cannot concur in my colleagues' invocation of jurisdiction in this case, I must respectfully dissent.

This court has long recognized the distinction between a statute which is unconstitutional on its face and a statute which is unconstitutional as applied. In the former situation, the provision itself is *invalid* from its inception and has no force and effect upon any person or entity. In contrast, when a statute is deemed unconstitutional as applied, the statute itself is not *invalid*, but is simply not applied to a particular case because to do so would violate some superior constitutional right. This distinction is critical, particularly with respect to this court's authority to entertain an appeal under Supreme Court Rule 302(a) (134 Ill. 2d R. 302(a)). That rule specifically limits our direct appellate jurisdiction to only those cases in which "a statute of the United

States or of this State has been held *invalid.*" (Emphasis added.) 134 Ill. 2d R. 302(a). It is precisely because Rule 302(a) speaks in terms of invalidity, as opposed to application, that this court will not ordinarily entertain direct appeals in cases involving an "as applied" determination. Thus, in *Rehg v. Illinois Department of Revenue*, 152 Ill. 2d 504, 508-09 (1992), we held that an appeal from an order which does not declare a statute unconstitutional on its face, but simply declares that the application of the statute would violate a particular defendant's constitutional right, "is properly brought in the appellate court pursuant to Rule 301." *Rehg*, 152 Ill. 2d at 509. In support of that conclusion, we stressed that "[s]uch an [as applied] order does not declare a statute unconstitutional," nor does it "invalidate" the statute for purposes of Rule 302(a). *Rehg*, 152 Ill. 2d at 509. We ultimately reached the merits of the controversy in *Rehg* under Rule 302(a), but only because the circuit court had also declared the Tax Act "unconstitutional on its face." *Rehg*, 152 Ill. 2d at 509. The circuit court did not make such a ruling in this case.

In the present case, the circuit court declared sections 10—1 and 10—10 of the Public Aid Code unconstitutional as applied. Specifically, the circuit court held:

> "It is therefore ordered, that the statutory provisions relied upon and cited herein, while not unconstitutional in the absolute sense, would lead to an unconstitutional result in the instant case, and accordingly the Order of August 1, 1995 granting the State's Attorney leave to intervene is set aside, and said Motion for Leave to Intervene is denied."

Consequently, because the circuit court did not find sections 10—1 and 10—10 facially unconstitutional, but only found that the provisions would, in some way, lead to an "unconstitutional result" as applied, this court lacks direct appellate jurisdiction under Rule 302(a), as interpreted in *Rehg*.

Notwithstanding the above, the majority declares that it "must look, however, to the effect of the circuit court's order to determine whether the order actually declared the statutory provisions unconstitutional on their face" for "[i]f the effect of the circuit court's order was to declare a statute unconstitutional on its face, this court has jurisdiction under Rule 302(a)(1)." 176 Ill. 2d at 420. Applying this rationale, the majority concludes that sections 10—1 and 10—10 were, "in effect," unconstitutional on their face despite the fact that the circuit court had clearly ruled that they were unconstitutional as applied. 176 Ill. 2d at 422. My colleagues reach this conclusion because, in their view, the circuit court's order could be applied to any person "financially capable" of pursuing child support without the assistance of the Department. 176 Ill. 2d at 422. I find this conclusion untenable.

I recognize, of course, that a determination that a statute is "unconstitutional as applied" may, under certain rare circumstances, be deemed a "*de facto*" declaration of the statute's invalidity for purposes of Rule 302(a). That situation, however, occurs only when the "as applied" ruling—although nominally pertaining to a particular person or set of persons—has the effect of rendering the statute unconstitutional as to *all* persons under *all* circumstances. For example, in *Doe v. Gainer*, 162 Ill. 2d 15 (1994), we entertained a direct appeal under Rule 302(a) from an order declaring certain sections of the Unified Code of Corrections unconstitutional as applied to a particular inmate. We did so because that particular inmate was representative of *all* inmates who could be affected by the statute in question. Thus, the "as applied" ruling was, for all intents and purposes, the functional equivalent of a ruling that the statute was facially unconstitutional. In contrast to *Doe*, the circuit court's ruling in this case is only applicable to

those individuals "financially capable" of pursuing child support without assistance from the Department. It is not applicable, however, to individuals who are "financially incapable" of pursuing such support. In fact, those persons may still receive Department assistance under sections 10—1 and 10—10, which remained *valid* as to them. Hence, because the provisions at issue remained valid as to some people, rather than "invalid" as to all people, we do not have direct appellate jurisdiction under Rule 302(a).

Significantly, the majority today fails to explain how an "as applied" ruling which is applicable to *less* than 100% of the persons contemplated by the statute constitutes the functional equivalent of facial declaration of invalidity. The majority also fails to explain what percentage of those persons must be so characterized in order for the circuit court's ruling to be viewed as "in effect" a declaration of unconstitutionality on its face. Nor does the majority explain how this court (or the appellate court, for that matter) will ever be able to determine when that number is great enough to warrant this court's direct appellate review. Indeed, I simply cannot fathom how such a determination can be undertaken—short of requiring parties in future cases to supply the reviewing court with statistical data which can establish the number of citizens potentially impacted by the "as applied" determination.

In view of these uncertainties, I am troubled by what I perceive to be the majority's nonchalant invocation of jurisdiction in this case. As I noted at the outset of this dissent, jurisdiction is not a matter of judicial convenience, but the very basis of a court's authority to decide the merits of a case. The majority offers little analysis in support of its decision to convert the circuit court's "as applied" order in this case into a *de facto* declaration of invalidity for purposes of Rule 302(a). It offers

even less guidance for determining when circumstances exist which justify making such a conversion. In fact, in failing to recognize this shortcoming, my colleagues have *unnecessarily* blurred the critical distinction between an "as applied" determination and a facial determination.

Finally, I view today's interpretation of Rule 302(a) as not only unfortunate, but unnecessary as well. We are not confronted here with a situation where the controversy might remain unresolved absent action by this court. Jurisdiction to hear this appeal remains with the appellate court pursuant to Supreme Court Rule 301 (155 Ill. 2d R. 301). Furthermore, once the appellate court issues its decision, this court may grant further review under Supreme Court Rule 315 (155 Ill. 2d R. 315). The appellate court could even certify the matter for our review pursuant to Supreme Court Rule 316 (155 Ill. 2d R. 316). In view of these potentialities, I consider the majority's decision, with all its attendant consequences, to be both unwarranted and improvident.

For all of the foregoing reasons, I respectfully dissent.

JUSTICE McMORROW joins in this dissent.