NO. 4-97-0095

IN THE APPELLATE COURT 

OF ILLINOIS

FOURTH DISTRICT

THE DEPARTMENT OF PUBLIC AID )  Appeal from 

ex rel. ANTOINETTE NALE, )  Circuit Court of 

Petitioner-Appellant, )  Macon County 

v. )  No. 88D150 

MI­CHAEL NALE ) 

Respondent-Appellee. )  Honorable

)  John L. Davis, 

)  Judge Presiding.

_________________________________________________________________

JUSTICE COOK delivered the opinion of the court:

Michael and Antoinette Nale were divorced in December 1988.  Two children were born to the parties:  Jessica, now age 17, and Garrett, now age 15.  Under the separation agree­ment in­cor­porated into the judgment for dissolution of marriage, Antoi­nette was designated primary physical custodian of the children and Mi­chael paid $400 per month in child support.  In August 1996, the Illi­nois Department of Public Aid (IDPA), acting on behalf of Antoi­nette, filed a peti­tion to modi­fy child support, which was de­nied in Octo­ber 1996.  In January 1997, IDPA's motion to recon­sid­er was de­nied.  We re­verse and remand with di­rec­tions.

When Antoinette and Michael separated in De­cem­ber 1988, they en­tered into a separation agreement that provided An­toi­nette had pri­mary physical custody of the children and Mi­chael was to have reason­able visitation rights.  This agreement was incorpo­rated into the order dissolving their marriage, entered later that month.  The agree­ment pro­vid­ed Mi­chael would pay child sup­port of $200 per month per child, sub­ject to modifi­ca­tion in accor­dance with stat­utory guidelines should Mi­chael re­ceive a pay increase.

In 1996, Antoinette availed herself of the child sup­port services of the IDPA, although she was not receiving public aid.  See 305 ILCS 5/10-1, 10-10 (West 1996); 
In re Marriage of Lappe
, 176 Ill. 2d. 414, 438-39, 680 N.E.2d 380, 392 (1997) (up­holding the con­sti­tu­tion­al­ity of IDPA's child support enforcement pro­gram).  In Au­gust 1996, the IDPA filed a peti­tion on be­half of An­toi­nette to in­crease child sup­port, al­leg­ing an in­crease in the children's needs and an in­crease in Michael's abil­ity to pay.  An­toinette attached her finan­cial affidavit to her petition.  In his re­sponse, Mi­chael ad­mitted both the children's needs and his abili­ty to pay have increased.  Michael requested that if the court in­creased his child support obliga­tion, he be awarded the state and federal income tax deduc­tions for the chil­dren and be given credit for the periods he has actu­al custody of the chil­dren for summer and holiday visits.

In October 1996, the trial court heard the petition to modify.  Antoinette's affidavit listed her gross annual income as $53,818, and her weekly gross income as $1,035 (or $4,484.83 per month).  After taxes and social secu­rity deduc­tions, Antoi­nette earns $831.95 per week ($3,605.12 per month).  She tes­ti­fied her most re­cent take-home pay was $1,130 for a two-week peri­od (or $2,260 per month).  The affi­da­vit indi­cates her month­ly ex­pens­es amount to $2,626.40, in addi­tion to $327.72 in car loans and cred­it card payments.

Michael's income had increased since the dissolu­tion.  He testified his "salary in 1989" was $32,000 to $33,000.  Ac­cord­ing to Michael's tax forms, he earned a gross income of $38,489.26 in 1993, $42,794.05 in 1994, and $45,516.36 in 1995.  Michael testi­fied that in 1996 his "annual salary [was] just over $51,000."  Ac­cord­ing to a recent pay stub, his take-home pay is $1,309.68 every two weeks for a period of nine months a year.  Michael has remar­ried since the dissolu­tion, and his tax returns suggest his cur­rent wife is also em­ployed.  

Antoinette testified the children stay with Michael more often than every other weekend and they spend one-half of holiday vacations with him.  Michael testified his son lived with him the first trimester of the school year and was with him for more than half of the summer.  Antoinette testified Garrett was with Michael half of the summer but Jessica stopped spending half of the summer with Michael two years before the hearing.  

In addition to $400 per month in child sup­port, Michael pays $150 per month to provide health insurance coverage for the children.  Mi­chael stat­ed he also pro­vided for all the children's needs dur­ing periods of ex­tended visita­tion and continued to pay the full amount of sup­port to Antoi­nette when he had cus­tody of the chil­dren.  Michael has taken several vacations with the chil­dren in the last few years and also gives them gifts on holi­days.

Antoinette testified the children's needs have in­creased significantly since the child support order in 1989.  An­toi­nette testified in general terms as to the types of expenses she in­curred on behalf of the children, but she was un­able to calculate and testify exactly how much it cost her each month to support the chil­dren.  Antoinette detailed significant expendi­tures for allowances, extracurricular activities, a car for Jessica, birthdays and Christmas, and vacations.   Antoinette tes­ti­fied the children have bank accounts at three different insti­tu­tions.  Each has about $1,000 in his re­spective account at the credit union, $2,000 each in a Putnam Investment account, and $400 to $500 each in a First Mutual In­vest­ment account.

On cross-examination Antoinette testified Jim Forester has lived in her home for three years.  She described him as her "significant other" and stated she planned to marry him some­time in the spring of 1997.  Forester earns $36,000 per year.  Antoi­nette tes­ti­fied For­est­er contributes to the household "no more than what his normal ex­penses would be."  He does not pay her rent or con­trib­ute to her mort­gage pay­ment, taxes, or insur­ance.  Forest­er does not pay for water and sewer servic­es.  Nor does Forester pay for tele­phone, trash col­lection, or cable tele­vi­sion.  Howev­er, An­toi­nette tes­tified Forester "pays his share in the house," stat­ing further that "ev­ery now and then he will pay a utility bill or a water bill" or pay the cleaning lady.  Antoi­nette tes­tified he some­times buys groceries, pays his own car insurance, and "takes care of other types of things around the house."  When the court asked her to pres­ent can­cel­led checks to docu­ment Forester's contribu­tions, she was unable to do so.

At the close of testimony, IDPA's counsel stated that though the statutory child support amount was $763.56 per month, the children's needs justified an upward deviation in child sup­port, to $800 per month.  Michael's counsel argued that some increase in child support was appropriate, given the rising needs of the children and his rising income.  However, he argued $600 per month was adequate.  He again requested the income tax exemp­tions and credit for time he spent with the children.

In pronouncing judgment, the trial court recited the statutory factors and then made the fol­low­ing state­ment:

"This court, after having considered the statutory factors, finds that the statutory amount is not appropriate in this situation, that the amount of support being paid under the current situation is adequate in view of the resources of the children, the physical and emotional needs of the children, and educational needs.  So far as this court is aware, Section 720 ILCS 5[/]11-8 [(West 1996), defining the misdemeanor crime of fornication,] [h]as 
not been repealed in this state and is still good law.  This woman comes before this court asking for an in­crease in child support but at the same time supports a man not her husband.  And yet argues to this court that she needs addi­tion­al support.  She is living in a[n] 
open state of fornica­tion in violation of the law.  This petition is denied."

In January 1997, Antoinette's motion to reconsider was heard.  Antoinette offered evidence of Forester's contributions to the household, but the trial court rejected it and did not allow her to make an offer of proof.  The trial court reaf­firmed its deci­sion to deny any in­crease in child sup­port. 

Section 510 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/510 (West 1996)) imposes cer­tain pre­req­ui­sites on modi­fi­ca­tions of child sup­port awards.  All agree that Michael's increased income constitutes a "substantial change in circumstances," sufficient to justify a modification of child support.  750 ILCS 5/510(a)(1) (West 1996).  Accordingly, we need not address whether Michael's increased income would also justify an award under the provisions for an automatic increase under section 510(a)(2)(A).  750 ILCS 5/510(a)(2)(A) (West 1996) (in IDPA cases, an increase of over 20% in the payor spouse's income auto­matically allows a modification of child support).

Once a modification is authorized under section 510, a trial court is to set the amount by considering the same factors used to de­ter­mine an ini­tial child support or­der.  See 
In re Marriage of Bussey
, 108 Ill. 2d 286, 296, 483 N.E.2d 1229, 1233-34 (1985).  The modifi­ca­tion of child sup­port pay­ments lies with­in the sound discretion of the trial court.  
Bussey
, 108 Ill. 2d at 296, 483 N.E.2d at 1233.

However, there are limits on this dis­cre­tion.  Sec­tion 505(a) of the Act creates a rebuttable pre­sump­tion that a speci­fied per­centage of a noncustodial parent's in­come represents an appropri­ate child support award.  
In re Mar­riage of Freesen
, 275 Ill. App. 3d 97, 105, 655 N.E.2d 1144, 1150 (1995).  This pre­sump­tion also applies in modification proceedings.  
People ex rel. Hines v. Hines
, 236 Ill. App. 3d 739, 745, 602 N.E.2d 902, 907 (1992).  Mi­chael, the party seek­ing a devi­a­tion from child sup­port guide­lines, has the burden of pro­ducing evi­dence justify­ing the devia­tion.  
In re Marriage of Blaisdell
, 142 Ill. App. 3d 1034, 1041, 492 N.E.2d 622, 627 (1986).  Compelling rea­sons must be pre­sent­ed to over­come the pre­sump­tion that the guide­lines will be ap­plied.  
In re Mar­riage of Stan­ley
, 279 Ill. App. 3d 1083, 1085, 666 N.E.2d 340, 341 (1996).

Initially, we address the trial court's focus on  Antoinette's living arrangement.  The stat­ute defin­ing for­nica­tion no longer defines mere co­hab­i­ta­tion as a crime.  Com­pare Ill. Rev. Stat. 1991, ch. 38, par. 11-8(a), with 720 ILCS 5/11-8(a) (West 1996).  More­over, while a custodial parent's fornica­tion could have, in some cir­cum­stanc­es, justi­fied a change of cus­to­dy prior to the amendment (see 
Jarrett v. Jarrett
, 78 Ill. 2d 337, 346-47, 400 N.E.2d 421, 424 (1979)), it provides poor grounds for limit­ing child support (
cf
. 
Peo­ple ex rel. Wing­er v. Young
, 78 Ill. App. 3d 512, 514, 397 N.E.2d 253, 255 (1979)
 (cut­ting off child sup­port is an inap­propriate sanc­tion for interfer­ence with court-ordered visita­tion)).  While this may be an ap­pro­priate response to some pa­rental misconduct, it is a dras­tic sanction, and the mov­ant bears a heavy burden of proof.  
Cooper v. Cooper
, 59 Ill. App. 3d 457, 466, 375 N.E.2d 925, 931-32 (1978).  It is not ap­pro­pri­ate for the trial court to raise the issue 
sua
 
spon­te
 and limit child support without any evidence or argument as to the effect of the living arrangement on the chil­dren or the appro­priateness of this particular re­sponse.

Antoinette's living arrangement could still be rele­vant inso­far as it affected her resources.  See 750 ILCS 5/505(a)(2)

(b) (West 1996).  The trial court's emphasis on the allegedly crim­i­nal na­ture of the rela­tionship sug­gests its prima­ry concern was not its effect on the household's re­sourc­es.  How­ever, on appeal we review the trial court's judg­ment, not its rea­son­ing.  See 
Leonardi v. Loyola Uni­ver­si­ty
, 168 Ill. 2d 83, 97, 658 N.E.2d 450, 457 (1995).

The trial court may not normal­ly exam­ine the fi­nan­cial sta­tus of oth­ers in the household who have no legal rela­tionship to the child.  
Cf
. 
In re Marriage of Keown
, 225 Ill. App. 3d 808, 813, 587 N.E.2d 644, 647 (1992) (in­come of obligor's spouse not to be con­sid­ered in de­ter­min­ing obligor's ability to pay child sup­port, except in equi­ty, to determine if payment would endanger ability of sup­port­ing party's household to meet its needs).  Still, the trial court may ensure child sup­port is, in fact, bene­fitting the children.  See Uniform Mar­riage and Di­vorce Act 9A U.L.A. §309, Comment, at 400 (1987).  Ac­cord­ing­ly, the trial court may devi­ate down­ward from child sup­port guide­lines if it deter­mines the sup­port­ing parent is using sup­port to pay for an un­war­rant­ed benefit to someone, such as For­ester, who is not entitled to sup­port.  See 
People ex rel. Gra­ham v. Adams
, 239 Ill. App. 3d 643, 647, 608 N.E.2d 614, 617 (1993).

However, the trial court's reliance on the mere fact that such a person lived in the recipi­ent house­hold effec­tively pun­ish­es the chil­dren for living ar­range­ments over which they have no con­trol.  See 
Department of Public Aid ex rel. Temple v. Van Kampen
, 243 Ill. App. 3d 767, 771, 612 N.E.2d 882, 885 (1993).  Ac­cording to Antoinette's unrebutted tes­ti­mo­ny, For­ester made some contri­bu­tions to the home.  While For­est­er ap­par­ent­ly re­ceived a wind­fall by liv­ing in the home with­out paying rent or utilities, there was no showing Antoi­nette con­ferred this bene­fit on him by using child support or resourc­es that would have oth­er­wise been avail­able for the chil­dren.  

We are not imposing a heavy burden on Michael.  We are well aware of the difficulties of discovering financial details about a household of which one is not a member.  In appropriate circum­stances, the financial resources of the parties may alone make it clear that someone other than the chil­dren is re­ceiv­ing the bene­fit of child support.  See 
Gra­ham
, 239 Ill. App. 3d at 646, 608 N.E.2d at 616-17 (deviation from the guidelines was appropri­ate where the re­cip­i­ent house­hold was destitute, so that guide­line amount would ef­fec­tive­ly make payor fa­ther pro­vide resources for entire house­hold, includ­ing children not enti­tled to sup­port).  Here, however, An­toi­nette had a well-paying job and could easi­ly have provided some living expenses for Forester while paying her share of the children's sup­port.  
Accordingly, the bur­den of pro­duc­tion re­mains with Mi­chael until he pres­ents more spe­cif­ic evi­dence that his child support is being di­verted to Forester or others.

The trial court mentioned it considered the needs of the children.  Michael notes there was little evidence regard­ing the actual cost to support the minor children, and there was no evi­dence the chil­dren were being de­prived in any way or that they were living a life­style below that which they would have enjoyed had the par­ties remained mar­ried.  

This argument is flawed.  First, it ig­nores the role of the stat­utory pre­sump­tion.  Again, Michael has the burden of pro­duc­ing evi­dence justify­ing the downward devia­tion from support guide­lines.  
Blaisdell
, 142 Ill. App. 3d at 1041, 492 N.E.2d at 627.  He can­not rely on Antoinette's fail­ure to pres­ent evi­dence to meet this burden.  More important, Mi­chael ad­mit­ted in his re­sponse to the peti­tion to modify that the needs of the children had in­creased since the dissolu­tion.  While Antoinette's finan­cial affidavit may have included some expenses that should have been at­tributed to For­ester, her tes­timo­ny still sup­port­ed this ad­mis­sion. 

In Michael's response to the petition to modify he also ad­mit­ted his income had increased.  The evidence at trial sup­ported this ad­mission.  If the evi­dence shows a significant in­crease in both the obligor's income and the needs of the chil­dren, and does not pro­vide any other evidence to suggest re­duced sup­port is appro­pri­ate, the trial court abus­es its dis­cre­tion by denying a peti­tion to in­crease child sup­port to conform to the statutory guide­lines.  See 
In re Mar­riage of Heil
, 233 Ill. App. 888, 895, 599 N.E.2d 168, 173 (1992).

The trial court mentioned the resources of the chil­dren justified a downward deviation from support guide­lines.  The re­cord dem­on­strates the chil­dren had bank ac­counts of roughly $3,500 each.  The re­sources of the chil­dren are rele­vant under section 505.  750 ILCS 5/505(a)(2)(a) (West 1996).  However, this fac­tor has only jus­ti­fied a re­duc­tion in child support when a child has sig­nif­i­cant fi­nan­cial re­sources relative to his par­ents.  See, 
e.g.
, 
In re Mar­riage of Frazier
, 205 Ill. App. 3d 621, 623, 563 N.E.2d 1236, 1238 (1990) (child support below stat­u­tory guide­lines war­ranted when child could access a $72,234.54 trust ac­count and child's estate far exceeded payor's finan­cial re­sourc­es); 
In re Marriage of Wentink
, 132 Ill. App. 3d 71, 80, 476 N.E.2d 1109, 1115 (1984) (child support below statutory amount with­in trial court's dis­cretion when child is beneficiary of two trusts valued in excess of $275,000, equal in value to roughly 87% of the parents' joint assets).  This is not such a case.

A deviation from child support guidelines can­not be jus­ti­fied by Antoinette's income alone.  It is true that An­toi­nette earns more than Michael.  Moreover, the statute ex­plic­itly pro­vides that both parents have an obligation to pro­vide finan­cial support for the children.  See 750 ILCS 5/505(a) (West 1996).  How­ev­er, the idea that a payor of child sup­port should pay re­duced child sup­port based on the custodian's income has repeat­edly been re­ject­ed.  See 
In re Mar­riage of Kern
, 245 Ill. App. 3d 575, 577, 615 N.E.2d 402, 404 (1993); 
Blaisdell
, 142 Ill. App. 3d at 1047-48, 492 N.E.2d at 631.

We also reject Michael's argument that the statutory guide­lines should not be applied here because of the parents' high incomes taken together.  It is true that the utility of the stat­u­to­ry child support guide­lines de­creas­es as the in­comes of the par­ties in­crease.  
In re Mar­riage of Harmon
, 210 Ill. App. 3d 92, 96, 568 N.E.2d 948, 951 (1991).  Child sup­port pay­ments are not in­tend­ed to be wind­falls to the chil­dren.  
In re Marriage of Bush
, 191 Ill. App. 3d 249, 261, 547 N.E.2d 590, 596-97 (1989).  How­ev­er, even with par­ents earning high incomes, the trial court must con­sid­er the stan­dard of liv­ing the child would have enjoyed had the par­ents re­mained married.  
In re Marriage of Lee
, 246 Ill. App. 3d 628, 644, 615 N.E.2d 1314, 1326 (1993).  

Applying the statutory guidelines in this case would not result in an unfair windfall to the children.  Cases in which the parents' high in­comes have jus­ti­fied a devi­ation from the stat­utory guide­lines have general­ly involved par­ents earning substan­tially more than the Nales.  See 
Harmon
, 210 Ill. App. 3d at 94-95, 568 N.E.2d at 950 (parents had a joint gross annual income of roughly $180,000, and the par­ties had three chil­dren)
; 
Bush
, 191 Ill. App. 3d at 253, 547 N.E.2d at 592 (par­ents had joint gross annual income of roughly $386,000 and the parents were support­ing one child).

For the reasons stated, we reverse the trial court.  The trial court did not make any findings as to the amount pro­vided by statutory guidelines, and specifically whether Michael is entitled to credit against his income for health insurance premiums.  See 750 ILCS 5/505(a)(3)(f) (West 1996).  Because it would be inappropriate for us to enter an award for a specific amount where such factual uncertainty remains, we remand with directions for the trial court to determine Michael's net income under the Act and enter a child support award equal to the amount provided by statutory guidelines.

Reversed and remanded with directions.

STEIGMANN and McCULLOUGH, JJ., concur.